10-2275 (L)
US v. Feldman

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term, 2010

(Submitted: May 25, 2011                    Decided: August 1, 2011)

Docket Nos. 10-2275-cr (L), 10-2276-cr (con)

———————————

UNITED STATES OF AMERICA,

*Appellee*,
v.

JEROME H. FELDMAN,

*Defendant-Appellant*.

———————————

Before:  McLAUGHLIN, POOLER, and SACK, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Northern District of

New York, David N. Hurd, Judge, convicting Jerome H. Feldman of one count of health care

fraud, *see* 18 U.S.C. § 1347; five counts of wire fraud, *see* 18 U.S.C. § 1343; and sentencing

Feldman to 188 months in prison and three years of supervised release.  Affirmed.

———————————

Vijay Shanker, Attorney (Lanny A. Breuer, Assistant Attorney General,
Greg D. Andres, Acting Deputy Assistant Attorney General, *on the brief*),
U.S. Department of Justice, Washington, DC, *for* Richard S. Hartunian,
United States Attorney (Brenda K. Sannes, Appellate Chief, *on the brief*),
Northern District of New York, Albany, NY, *for Appellee*.

James F. Greenwald, Assistant Federal Public Defender (James P. Egan,
*on the brief*), *for* Alexander Bunin, Federal Public Defender, Syracuse,
NY, *for Appellant*.

———————————

POOLER, *Circuit Judge*:

Jerome H. Feldman, once a practicing psychiatrist, defrauded Medicare by receiving funds he was not entitled to receive and then fled the country to live as a fugitive in the Philippines. There, Feldman created the website www.liver4you.org, fraudulently promising to provide critically ill patients liver or kidney transplants for $65,000 to $130,000. After Feldman was located in the Philippines and deported to the United States, Feldman was prosecuted for such conduct. Feldman pleaded guilty to one count of health care fraud, *see* 18 U.S.C. § 1347, and five counts of wire fraud, *see* 18 U.S.C. § 1343, and was sentenced to 188 months in prison and three years of supervised release. Feldman appealed, arguing that the district court committed four procedural errors in calculating Feldman's offense level and imposed a substantively unreasonable sentence.

This case raises two novel issues. First, the Government argues that we should not consider the four procedural errors claimed by Feldman because at sentencing the district court stated it would impose "the same sentence" even without some of the alleged errors. We reject this contention for the reasons expressed herein and we emphasize that such predictions are only rarely appropriate. Second, Feldman argues that his liver4you.org website was not mass-marketing pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(ii) because he did not initiate contact with his victims; they found his website – publicly available online – and emailed him at an address listed on the website. We reject Feldman's distinction. Feldman committed fraud by using the internet to solicit a large number of persons to buy his organ transplant services. The enhancement applies even if Feldman did not use the most active marketing method possible.

-2-

## I.

The facts relevant to this appeal are largely taken from the presentence report ("PSR") prepared by Feldman's supervising probation officer. Because all but one of the PSR's factual findings were adopted by the district court for purposes of sentencing, and such findings are necessary to our review, the PSR is hereby unsealed to the extent this opinion describes the information within it.

### A.

From 1995 to 1997, Feldman, a practicing psychiatrist, owned and operated the Jerome Feldman Community Mental Health Center ("JFC Center") in two locations in Florida. Feldman applied for federal certification of the JFC Center as a community mental health center. With such certification, the JFC Center would be eligible for Medicare reimbursement of the reasonable costs of providing partial hospitalization services to Medicare patients. *See* 42 U.S.C. § 1395x(ff) (1994) (defining, inter alia, "partial hospitalization services" and "community mental health center"); *see also id.* § 1395*l*(a)(2) (specifying amount of reimbursement). In his application, Feldman vouched that the JFC Center provided all psychiatric services that Medicare required community mental health centers to provide. *See id.* § 300x-2(c)(1) (listing Medicare-required services that community mental health centers must provide to patients). In March 1995, the JFC Center received a Medicare provider number, allowing it to file Medicare claims and be reimbursed for services provided at the Center. Feldman also retained his personal Medicare and Medicaid provider numbers he had received in 1986.

By June 1997, after operating the JFC Center for two years, Feldman had filed claims for, and had received, over a million dollars of Medicare and Medicaid funds. That month, state and federal officials began investigating whether the JFC Center submitted fraudulent claims for

reimbursement. Investigators interviewed JFC Center employees, who admitted numerous violations of Medicare rules. One employee, hired by Feldman in 1995, told investigators that Feldman, among other things, instructed employees to falsify patient progress notes for Medicare reimbursement and charged Medicare for group therapy services that he did not personally provide.

The medical records supported these admissions. Investigators asked to review medical records for a sample of 20 Medicare patients who Feldman claimed received partial hospitalization services at the JFC Center. Four of the 20 records could not be located and the remaining 16 records all lacked the required physician orders for partial hospitalization services and did not otherwise qualify for Medicare reimbursement.

The physical premises also concerned the investigators. Believing that the JFC Center's building was "in extreme disrepair, unsafe, and unsanitary," investigators immediately contacted the Orange County Health Department. The very same day, state officials condemned the building after discovering, among other violations, that the building lacked running water and fire safety equipment.

Because the JFC Center building had been condemned and Feldman was suspected of filing fraudulent claims, Feldman's and the JFC Center's Medicare provider numbers were terminated in June 1997. A few months later, in September 1997, Feldman's Medicaid provider number was suspended. All Medicare and Medicaid payments to the JFC Center were suspended. From August 1996 to June 1997, Feldman's false and fraudulent claims caused a total Medicare and Medicaid loss of $1,131,771.

**B.**

During an overlapping time period – from 1996 to 1999 – Feldman owned and operated three HIV clinics in Florida called "Second Chance in Life." Because Feldman was suspended from the Medicare program and his Medicare provider number had been terminated, Feldman was prohibited from receiving Medicare funds until he rebutted his suspension or applied for reinstatement of his provider number. Despite this requirement, Feldman instead hired doctors with their own provider numbers and then billed Medicare under those doctors' provider numbers, receiving over $207,000 in Medicare payments from one doctor and over $378,000 from another.

**C.**

On August 23, 1999, Feldman entered into a plea agreement with the United States, admitting that he was guilty of committing health care fraud through his operation of the JFC Center. Thereafter, Feldman failed to appear for an initial conference in the District Court for the Middle District of Florida on October 5, 1999. As a result, the United States filed a criminal complaint against Feldman; the district court issued an arrest warrant for Feldman; and on November 10, 1999 Feldman became a fugitive from justice. Although not known by law enforcement officials at the time, Feldman had fled the United States to live in the Philippines as a fugitive.

**D.**

After fleeing U.S. authorities, and with an arrest warrant outstanding, Feldman hoped to capitalize on a Philippine policy (rescinded in 2008) allowing foreign visitors to obtain organ transplants from unrelated Filipino living donors. In November 2000, Feldman registered the website www.liver4you.org using the alias "Alberto Gomez." By May 2001, the website was

publicly available and offered live kidney transplants and live or cadaver liver transplants allegedly to be performed by qualified surgeons in a Philippine hospital. The website claimed that the transplant program was run by the Philippines Ministry of Health, and listed the following prices:

> kidney transplant: $65,000-$95,000
> liver transplant: $130,000

The website listed several email addresses, including fastertransplant@yahoo.com, at which persons interested in obtaining an organ transplant could request further information. "Dr. Mitchel Michaelson" and his associate "Alberto Gomez" – both aliases of Feldman's – promised to arrange a patient's transplant surgery.

In addition to the website, Feldman used various aliases to open bank accounts and UPS mailboxes in the United States. Feldman opened one bank account in DeWitt, New York and a mailbox in Fayetteville, New York, both near his wife's residence in Baldwinsville, New York.

During the course of his liver4you.org scheme, Feldman attracted at least five patients. As described below, each patient (or caretaker) learned from the liver4you.org website of Feldman's offer to secure an organ transplant; initiated contact with Feldman using an email address listed on the liver4you.org website; paid money to Feldman to receive an organ transplant; and learned, after traveling to the Philippines, that Feldman lacked the power, outside of the normal workings of the Philippine medical system, to guarantee an organ transplant. In total, the five patients or their caretakers lost over $300,000.

**1.**

In March 2006, the first patient's son emailed Feldman at fastertransplant@yahoo.com, the email address listed on Feldman's liver4you.org website. The son told Feldman that his father was in dire need of a kidney and was desperately seeking a transplant. Feldman, using the

alias Dr. Mitch Michaelson, promised the son that he would arrange a transplant, in a legal manner, for $85,000.  On May 8, 2006, the patient wired a $30,000 initial payment to Feldman's DeWitt bank account and shortly thereafter flew to Manila, Philippines.  When Feldman met the patient in the Philippines, he demanded that the patient pay more money before the kidney transplant surgery would be performed.  The patient then gave Feldman $10,000 in cash and wired an additional $20,000 to Feldman's DeWitt bank account.

After the payments, Feldman informed the patient that, contrary to his earlier assurances, there was no kidney donor for the patient in Manila.  Feldman then instructed the patient to travel to a hospital in Davao City, where Feldman promised a donor was available.  Again, however, no donor was available.  Desperate, the patient gave $1000 in cash to the secretary of a Philippine surgeon at the Davao City hospital, in an effort to quickly find a donor.  Unsuccessful, the patient returned to the United States without receiving a transplant.  Although the patient asked Feldman to refund the $60,000 the patient paid, Feldman refused and instead told the patient that he could receive a transplant if he paid an additional $20,000.  The patient never received a transplant – or a refund – from Feldman, but the patient later received a kidney transplant in the United States.

**2.**

In the fall of 2005, the second patient saw the liver4you.org website and emailed Feldman for more information.  Feldman told the patient that he worked in the Philippines and could obtain a kidney transplant for the patient.  After the patient spoke with Feldman, and with a man who told the patient that Feldman helped him obtain a kidney transplant in the Philippines (but who refused to provide his name), the patient agreed to pay Feldman to obtain a kidney transplant.

-7-

In June 2006, the patient wired an initial payment of $65,000 to the Alberto Gomez bank account in DeWitt. A few days later, the patient traveled to the Philippines with his wife. After arriving, the patient received dialysis at a small, substandard office, at which he contracted an infection. A few days later, the patient met with a doctor at a Philippine hospital in Manila. The patient said it was obvious that Feldman had never previously contacted this doctor, but simply paid the doctor's clerk to arrange an immediate appointment. When the patient met with this doctor, the doctor said the kidney transplant would cost $50,000. Feldman told the patient that he wanted to negotiate the price and shop around for a kidney transplant. Nevertheless, the patient stayed at the Manila hospital and continued to be treated by the Philippine doctor. Three weeks later, the Philippine doctor found a donor match. The patient agreed to pay the doctor $50,000 – on top of what the patient had paid Feldman – and on July 17, 2006, the patient received a kidney transplant. Although the patient asked Feldman for a refund of the $65,000 he paid, Feldman refused.

**3.**

After reading Feldman's liver4you.org website, the third patient emailed Feldman. Feldman assured the patient that he had an available kidney donor and surgeons available to perform the surgery in the Philippines. On May 10, 2007, the patient agreed to pay Feldman, wiring $43,000 to the Alberto Gomez account in DeWitt. About a month later, on June 5, the patient wired an additional $27,000 to that account.

When the patient arrived in the Philippines, the patient learned that Feldman had located neither a kidney donor nor a surgeon. As Feldman privately admitted at the time, "I am doing what I can money wise. I will delay this man's medical/SURGICAL service to push him for more money while pressing the Doctors to lower their charges. Playing off one against the

-8-

other." Indeed, Feldman forced the patient to wait in Manila, stating that no kidney donor was available. There is no record, however, that the patient paid Feldman additional money. After waiting in Manila, Feldman instructed the patient to travel to Davao City, where the patient received a kidney transplant from a Philippine doctor. The patient returned to the United States but died from complications from the surgery on August 1, 2007. After the patient's death, the patient's family received bills for the cost of hospitalization in the Philippines, although Feldman had assured the patient that he would use the $70,000 payment he received to cover all of the patient's medical expenses. Feldman refused to refund the money.

**4.**

After seeing Feldman's liver4you.org website, the wife of Feldman's fourth patient emailed Feldman to discuss obtaining a liver transplant for her husband. The patient's wife told Feldman that her husband was seriously ill; had bleeding esophageal varices (veins in the lower esophagus), which were banded to prevent further bleeding; and could leave his hospital only on a doctor's pass. Feldman promised to arrange the transplant, "legally," in the Philippines for $70,000, a price that he stated would cover medical expenses in the Philippines.

Concerned about the transaction, the patient's wife asked that a lawyer be involved. Feldman rejected this request, stating that time was critical. In addition, Feldman assured the patient's wife that if her husband did not receive a transplant, her money would be refunded.

In May 2008, the patient's wife sent Feldman a down payment of $37,000, by wire transfer to his Alberto Gomez account in DeWitt. Feldman agreed that the patient's wife could pay the remaining $33,000 when her husband met and was satisfied with the treating surgeon in the Philippines.

Despite being advised not to travel by his doctors, the patient traveled to the Philippines

with a friend. After arriving, the patient received little assistance from Feldman, and after several days had to enter a local hospital. More than two weeks after arriving in the Philippines, the patient still had not met with a transplant surgeon, and had been visited only once, and briefly, by Feldman. When the patient's wife complained to Feldman about the delay, Feldman stated that the surgeon wanted the full $70,000 and asked, "Should I tell him that you are no longer interested?"

While the patient was waiting at the local hospital, doctors advised him that Manila hospitals had a "poor" success rate for liver transplants and suggested that he instead travel to Singapore or China for a transplant. When the patient's wife asked Feldman about this advice, Feldman minimized the poor results in the Philippines as anomalous and discouraged the patient from traveling elsewhere. Feldman promised that "all the doctors in the Philippines needed to do was match [the patient's] blood type."

As the days passed without progress, the patient's wife continued to email Feldman, asking him to keep his promise. In response, Feldman blamed the supposed transplant doctor for the delay and warned the patient's wife not to call the doctor because the doctor would "sense fear for the patient and double his fee." Feldman pressured the patient's wife for the remaining $33,000, saying, "How will you live with yourself if you fail [your husband] by being so cost conscious?" The patient's wife begged Feldman for time to reverse mortgage her home for additional money – noting that they already had "sen[t] you our life savings." A week later, the patient's wife wired an additional $33,000 to the Alberto Gomez account in DeWitt.

At that point, independent of Feldman, the Manila hospital transferred the patient to another hospital. Nevertheless, almost one month after arriving in the Philippines, the patient had not received a transplant, and his health was rapidly deteriorating. The patient's wife

emailed Feldman, complaining that her husband had a fever, was not receiving proper care, and was being asked by doctors for more money.  Two weeks later, the patient died of liver failure.  Feldman ceased all communication with the patient's wife.  As a final insult, the patient's wife received $27,000 in bills from the Philippine hospitals where her husband stayed.  Despite his promise that those costs were covered, Feldman refused to pay any of the bills and refused to refund any money.

**5.**

Lastly, the father of the fifth patient, after conducting research on the internet and finding Feldman's liver4you.org website, emailed Feldman in September 2008.  Less than a month later, the father wired Feldman $45,000 to the Alberto Gomez account in DeWitt, as a partial payment for his son's liver transplant.  After Feldman received the money, he told the patient's father that the patient was third on the liver transplant list and offered to "bump" him up to first for an additional $30,000.  The father refused to pay this sum but spoke with Feldman five additional times before October 21, 2008, when the son died before traveling to the Philippines.  After his son's death, the father asked Feldman to refund the $45,000 payment, but Feldman refused and ceased all communication with the father.

**E.**

On February 3, 2009, U.S. authorities located Feldman in the Philippines.  On February 11, a grand jury in the Northern District of New York indicted Feldman with five counts of wire fraud, *see* 18 U.S.C. § 1343, based on Feldman's liver4you.org scheme to defraud organ transplant patients.  The five wire fraud counts were based on two wire transfers by the first organ transplant patient, two wire transfers by the fourth patient, and one wire transfer by the fifth patient, all to Feldman's Alberto Gomez bank account in DeWitt.  On March 18, the

-11-

Philippines deported Feldman to Guam, where he was arrested for wire fraud. Feldman then consented to his removal to the Northern District of New York.

On August 6, 2009, the government filed an information in the Middle District of Florida, charging Feldman with one count of health care fraud, *see* 18 U.S.C. § 1347, based on Feldman's use of Medicare provider numbers while operating his Second Chance in Life clinics. That same day, Feldman waived indictment, entered into a plea agreement with the U.S. Attorney for the Middle District of Florida, and consented to the transfer of the case to the Northern District of New York, *see* Fed. R. Crim. P. 20(a), where the case was joined to the wire fraud case. On August 7, Feldman pleaded guilty to the health care count and the five wire fraud counts.

On May 27, 2010, the district court sentenced Feldman. The district court increased Feldman's base offense level by 16 levels, after finding that Feldman was responsible for $2,027,796.63 in total losses, *see* U.S.S.G. § 2B1.1(b)(1), given $1,131,771.05 from the JFC Center false claims fraud, $586,040.58 from the "Second Chance In Life" fraud, and $309,985 from the organ transplant wire fraud. In addition, as relevant here, the district court increased Feldman's base offense level by two levels for committing wire fraud through mass-marketing using the liver4you.org website, *see id.* § 2B1.1(b)(2)(A)(ii); two levels because the wire fraud involved the conscious or reckless risk of death or serious bodily injury, *see id.* § 2B1.1(b)(13)(A); and two levels for obstructing justice by fleeing to the Philippines and remaining a fugitive for nearly a decade, *see id.* § 3C1.1.

The district court considered the resulting Guidelines range of 151 to 188 months and imposed a sentence of 188 months in prison. The district court stated that the sentence was appropriate because of Feldman's "egregious conduct," "gross disregard for suffering," and "indifference to the healthcare of seriously sick people."

Feldman timely appealed, arguing that the district court committed (a) procedural error by erroneously imposing sentence enhancements for mass-marketing, loss amount, conscious or reckless risk of death or serious bodily injury, and obstruction of justice; and (b) substantive error by sentencing Feldman to 188 months in prison.

**II.**

As an initial matter, the Government argues that we need not decide – at all – whether the district court correctly calculated the applicable Guidelines range because "[the district] court could not have been clearer that it would impose the same sentence if its Guidelines determinations were inaccurate." At sentencing, the district court stated that "even if some of my rulings regarding the enhancements or the grouping are inaccurate, there is no question that I still would give the same sentence I am about to give under [18 U.S.C. §] 3553(a)." Given this statement, the Government argues that "this Court should decline to consider Feldman's claims of procedural sentencing error."

As this Court has recognized, an error in a district court's Guidelines calculation is harmless if "it could not have supported any lesser sentence." *United States v. Parker*, 577 F.3d 143, 147-48 (2d Cir. 2009). In *Parker*, for example, the alleged error in calculating the defendant's criminal history category "was necessarily harmless" because, even absent the alleged error, the challenged sentence was "dictated by statutory mandated minimums." *Id.* at 147 (noting that the district court imposed "the lowest term of incarceration permitted by law"); *see also United States v. Sharpley*, 399 F.3d 123, 127 (2d Cir. 2005) (finding alleged sentencing error harmless because sentence was set at mandatory minimum and therefore "any reduction in the calculated Guidelines range could not reduce [defendant's] actual sentence"). Here, however, eliminating any of the four challenged enhancements would have supported a lesser

sentence. The challenged aspect of each enhancement resulted in a two-level increase in Feldman's Guidelines offense level (a total eight-level increase), resulting in a higher Guidelines-recommended sentence.

The Government does not argue that the challenged enhancements "could not have supported any lesser sentence," as required by *Parker*. Instead, the Government argues that the district court would have imposed "the same sentence" regardless of whether the enhancements were eliminated. That is, even if the district court was presented with a lower Guidelines-recommended sentence, the district court would have imposed the same sentence. Therefore, the Government argues that "this Court should decline to consider Feldman's claims of procedural sentencing error."

The Government principally relies on two cases for this argument. In the first, *United States v. Sanchez*, 517 F.3d 651 (2d Cir. 2008), this Court noted that the sentencing transcript "leaves the strong impression" that the district court believed – erroneously – that it lacked the authority to impose a non-Guidelines sentence on the defendant. *Id.* at 665-66. Despite this apparent error, the Court stated that it would not remand "if the record indicated clearly that the district court would have imposed the same sentence had it had an accurate understanding of its authority." *Id.* at 665. At sentencing, the district court had stated that "in this particular case I am of the view that even if I could I would not impose a sentence less than I have determined." *Id.* at 666 (emphasis omitted). However, this Court found this statement ambiguous because the district court also stated that it felt constrained by the statute and "might" impose a lesser sentence "if [it] could." *Id.* Because it was not unambiguously clear that the same sentence would be imposed absent the error, this Court remanded the case to the district court for resentencing. *Id.*

-14-

In the second case, *United States v. Jass*, 569 F.3d 47 (2d Cir. 2009), this Court found that the district court erroneously applied a two-level sentence enhancement. *Id.* at 67-68. The Court then asked whether the error was harmless:

> Where we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing.

*Id.* at 68 (internal quotation marks omitted). In that case, the district court, "[r]ecognizing that the applicability of [the disputed enhancement] to this case was by no means clear, and inviting appellate review and action on [the] unsettled question of law, . . . unequivocally stated that it would impose the same . . . sentence on [the defendant] however 'the issue of [the disputed enhancement] ultimately works out [on appeal].'" *Id.* Because the district court was uncertain whether the disputed enhancement applied, and stated unambiguously that it would impose the same sentence if the Guidelines calculation did not include such enhancement, this Court found the error harmless. *Id.*

*Sanchez* and *Jass* stand for the proposition that if a district court errs in calculating a defendant's Guidelines sentencing range, this Court cannot assume, without unambiguous indication to the contrary, that the sentence would be the same absent the error. This case law is relevant here because, unlike *Parker*, the Guidelines-recommended sentence would have been lower absent the alleged Guidelines calculation errors. *See Jass*, 569 F.3d at 67-68 (considering first whether there was procedural error and only then determining whether the error was harmless). Therefore, the question before us is whether the record is unambiguous that the district court would issue "the same sentence" even absent all four of the challenged enhancements.

-15-

During sentencing, the district court stated that "even if some of my rulings regarding the enhancements or the grouping are inaccurate, there is no question that I still would give the same sentence I am about to give under [18 U.S.C. §] 3553(a)." Contrary to the Government's assertion, this statement is not an unambiguous declaration that the district court "would impose the same sentence even if its [four challenged] Guidelines determinations were overturned." The district court referred, without specificity, to "some" of the enhancements, without stating which enhancement – or which combinations of enhancements – would not affect Feldman's sentence. For that reason, this case is unlike *Jass*, which dealt with a single enhancement, specifically identified by the district court – and identified as uncertain – and imposed with the explicit and unambiguous declaration that the enhancement did not affect the ultimate sentence. *See Jass*, 569 F.3d at 67-68. Indeed, this case is controlled by *Sanchez*, where we found it ambiguous whether the claimed error affected the district court's sentence. *See Sanchez*, 517 F.3d at 665-66.

Moreover, because the correct Guidelines range is "the starting point and the initial benchmark" for federal sentences, *Gall v. United States*, 552 U.S. 38, 49 (2007), we cannot lightly assume that eliminating enhancements from the Guidelines calculation would not affect the sentence. *See also United States v. Booker*, 543 U.S. 220, 259 (2005) ("[The federal sentencing statute] requires judges to consider the Guidelines sentencing range established for the applicable category of offense committed by the applicable category of defendant." (internal quotation marks and ellipsis omitted)). We are especially wary of making such an assumption here, where each alleged erroneous enhancement resulted in a two-level increase, and if all of Feldman's claims were correct, his Guidelines sentencing range of 151 to 188 months would have been cut by more than half, to 63 to 78 months. *See United States v. Malki*, 609 F.3d 503,

-16-

511 (2d Cir. 2010) ("Although the [district court] stated that a lesser sentence would be 'inappropriate,' we cannot be confident that [it] would have imposed the same sentence had [it] understood that the bottom of the correct guideline was 58 months less than the bottom of the guideline [it] thought was applicable."). Similarly, because "the sentencing transcript leaves doubt that the District Court would have imposed the same sentence" absent the four enhancements or adjustments, *id.*, we cannot say that all four, together, were harmless.

Lastly, we note that a district court generally should not try to answer the hypothetical question of whether or not it definitely would impose the same sentence on remand if this Court found particular enhancements erroneous. Although the district court answered the hypothetical question in *Jass*, it did so because it "recogniz[ed]" that the enhancement's applicability "was by no means clear" and it hoped that "appellate review and action" would resolve an "unsettled question of law." *Jass*, 569 F.3d at 68. No such reasons were present here. Nor do we believe that criminal sentences may or should be exempted from procedural review with the use of a simple incantation: "I would impose the same sentence regardless of any errors calculating the applicable Guidelines range."

In sum, we reject the Government's argument that we should decline to consider the four procedural errors alleged by Feldman. If a district court errs in calculating the defendant's Guidelines sentencing range, resulting in a higher Guidelines-recommended sentence, this Court cannot assume, without unambiguous indication to the contrary, that the sentence would be the same absent the error. Therefore, as we did in both *Sanchez* and *Jass*, we now consider whether the procedural errors alleged by the defendant are, in fact, errors.

**III.**

We review criminal sentences "for abuse of discretion, a standard that incorporates de

novo review of questions of law (including interpretation of the [Sentencing] Guidelines) and clear-error review of questions of fact." *United States v. Bonilla*, 618 F.3d 102, 108 (2d Cir. 2010) (internal quotation marks omitted). A sentencing court commits procedural error by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51.

## A.

Feldman argues that the district court erred by applying a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(ii). Under that provision, a fraud offense is subject to a two-level Guidelines increase if the offense "was committed through mass-marketing." *Id.* The Sentencing Commission's Application Note defines "mass-marketing" as:

> a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit.

*Id.*, Application Note 4(A); *see also United States v. Walker*, 595 F.3d 441, 445 (2d Cir. 2010) ("'[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.'" (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993))). As an example, the Note states that "'[m]ass-marketing' includes . . . a telemarketing campaign that solicits a large number of individuals to purchase fraudulent life insurance policies." U.S.S.G. § 2B1.1, Application Note 4(A). Here, Feldman conducted an internet campaign soliciting a large number of individuals to pay thousands of dollars to secure an organ transplant. Such conduct is mass-marketing for purposes of the Section 2B1.1(b)(2)(A)(ii)

-18-

enhancement.

Feldman argues that the enhancement does not apply for two principal reasons. First, Feldman argues that his liver4you.org website was not "solicitation" because "[t]he only way someone could have viewed his website was either by directly entering the internet address or through a third-party search engine." We disagree. Soliciting individuals to purchase organ transplants was the very reason the website existed – as even the name liver4you.org makes clear. The Section 2B1.1(b)(2)(A)(ii) enhancement does not require that Feldman use the most active marketing method possible. *See United States v. Deming*, 269 F.3d 107, 109 (2d Cir. 2001) (mass-marketing includes use of "printed advertisements and brochures" to solicit customers). Feldman created a public website, available for viewing by anyone with an internet connection, and he did so to attract people desperate for organ transplants. Feldman's offer on a public website to provide organ transplants, with listed prices, and with contact information for interested purchasers, is among the types of mass-marketing contemplated by Section 2B1.1(b)(2)(A)(ii). *See United States v. Hall*, 604 F.3d 539, 545 (8th Cir. 2010) (affirming enhancement where defendant "operated a website devoted to the solicitation of investments in his fraudulent scheme").

Second, Feldman argues that the Section 2B1.1(b)(2)(A)(ii) enhancement does not apply because the liver4you.org website "was not intended to induce a large number of persons to purchase goods or services" because "only a very limited number of people would have any interest" in an organ transplant. We disagree. As the Sentencing Commission understood, because a single public website on the internet can, and is designed to, reach a large number of people, use of such a website to induce people to enter into a fraud can vastly increase the scale of the fraud, making the defendant more culpable. *See United States v. Heckel*, 570 F.3d 791,

-19-

795 (7th Cir. 2009) (mass-marketing enhancement applies where method of solicitation "exposes more consumers to the fraud than otherwise would have been possible").

Here, Feldman's liver4you.org website was publicly available, soliciting anyone who could read it and write an email – a large population, even if it reached only those who could read English.  *See United States v. Christiansen*, 594 F.3d 571, 576 (7th Cir. 2010) (finding that defendant's posting of "an online advertisement that was open to the public shows that she designed her scheme to induce a large number of victims").  Although the enhancement defines mass-marketing in terms of "a large number of persons," U.S.S.G. § 2B1.1, Application Note 4(A), the liver4you.org website was available to all throughout the world, and we take judicial notice of the fact that the number of people throughout the world who need liver or kidney transplants is, unfortunately, not so limited.  Even limited to the United States, the U.S. Department of Health and Human Services reports that 80,000 to 90,000 people were waiting for a kidney or liver transplant in each of the years 2006, 2007, and 2008, during which Feldman conducted his liver4you.org scheme.  U.S. DEP'T HEALTH & HUM. SERVS., *Chapter I: Trends in Organ Donation and Transplantation in the United States, 1999-2008*, at 3, 8, 12 (2009), *available at* http://optn.transplant.hrsa.gov/ar2009/chapter_i_forprint.pdf (last visited July 14, 2011) (reporting patients on active and inactive waiting status).  Moreover, Feldman has provided no indication that the website was so limited in distribution that it was not able to reach a large number of persons.  In sum, the district court did not err by applying a two-level mass-marketing enhancement pursuant to Section 2B1.1(b)(2)(A)(ii).

**B.**

Feldman also challenges the enhancement for loss amount.  *See* U.S.S.G. § 2B1.1(b)(1). In fraud cases, the Sentencing Guidelines provide that "specific offense characteristics," such as

loss amount, are based on all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2).

The relevant Application Note provides that two or more offenses are part of a "common scheme or plan" when they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Id.*, Application Note 9(A). In addition, "[a]cts may be found to be part of the same course of conduct if the defendant engaged in a repeated pattern of similar criminal acts, even if they were not performed pursuant to a single scheme or plan." *United States v. Brennan*, 395 F.3d 59, 70 (2d Cir. 2005) (internal quotation marks omitted).

Feldman argues that although the district court found that his JFC Center fraud resulted in an estimated loss of $1,131,771.05, such conduct was neither part of "the same course of conduct" nor part of a "common scheme or plan" with respect to any offense of conviction. Therefore, Feldman argues, that figure should not have been included in the loss amount and his offense level should not have been increased by two levels.

Although Feldman pleaded guilty in the district court only to the Second Chance in Life fraud and liver4you.org fraud, his conduct during the JFC Center fraud would be relevant to sentencing here if it was part of "the same course of conduct" or a "common scheme or plan" with respect to either offense of conviction.

Feldman argues that the Second Chance in Life provider number fraud was so different in kind from the JFC Center reimbursement fraud that the two frauds could not have been part of "the same course of conduct" or a "common scheme or plan." Feldman admits that his "operation of the [JFC] Center was fraudulent in that he billed for both ineligible clients and services," but he argues that his "operation of the [Second Chance in Life] clinics was legitimate

-21-

from the period it opened until the termination of Feldman's provider numbers."

Regardless of whether Feldman's JFC Center fraud and Second Chance in Life fraud were part of a common scheme or plan to defraud Medicare, they constituted "the same course of conduct" under Section 1B1.3(a)(2). Feldman operated both health care facilities in Florida and he used both to acquire hundreds of thousands of dollars of Medicare funds that he was ineligible to receive. After he was caught committing Medicare fraud at the JFC Center, he attempted to, and for a time did, fraudulently receive Medicare funds while operating the Second Chance in Life facility. The two frauds were "part of a single episode, spree, or ongoing series of offenses" committed by Feldman when he lived in Florida, and therefore the offenses are part of "the same course of conduct." U.S.S.G. § 1B1.3, Application Note 9(B). Thus, the district court did not err in including in the Guidelines calculation the loss amount for which Feldman was responsible at the JFC Center.

## C.

Feldman also challenges the district court's two-level enhancement pursuant to Section 2B1.1(b)(13)(A), for committing a fraud involving "the conscious or reckless risk of death or serious bodily injury."

As the relevant Application Note provides, "serious bodily injury" means "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, Application Note 1(L). For the enhancement to apply:

> [A] defendant's fraudulent conduct must have created a risk that
> others would suffer serious bodily injury; moreover, said risk must
> have either been known to the defendant (conscious), or, if unknown

> to the defendant, the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do (reckless).

*United States v. Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003).

The district court, adopting the PSR, found that "Feldman was well aware his victims suffered from serious health problems" and that "[h]is false promises to have a transplant procedure fully arranged prior to [the fourth patient's] arrival in the Philippines . . . put [the fourth patient] at risk of death."

Feldman argues that such an enhancement was improper, asserting that he "offered to facilitate necessary medical treatment" and did not provide or offer to provide "medical services that placed people in a worse position." Feldman acknowledges that he "misrepresent[ed] his capacity to facilitate organ transplants" and that his patients, including the fourth patient, relied on this information and flew to the Philippines. However, Feldman argues that "[the fourth patient's] organ failure put him at risk of death, and Feldman did nothing to hasten his, or any one else's, failing health."

However, the facts as found by the district court tell another story. Feldman's fourth patient "had serious health issues, resulting in [him] having his varices banded, and he was only able to leave his hospital on passes." Despite knowing that the patient's treating doctors had discouraged the trip, Feldman nevertheless convinced the patient to fly to the Philippines. When the patient arrived and entered a Philippine hospital, doctors at the hospital warned the patient that hospitals in Manila had not done many liver transplants and the success rate was "poor." The doctors recommended that the patient receive a transplant in Singapore or China, rather than in the Philippines. Feldman, however, convinced the patient not to leave the Philippines. Feldman did so to obtain an additional $33,000 from the patient, after falsely promising that he

had a doctor ready to perform the transplant. The trip resulted in disaster for the patient: The Philippine hospital, untrained and unequipped to treat the patient, transferred him to a different hospital, where the patient died days later of liver failure, thousands of miles from his family.

From this evidence, the district court did not clearly err by finding that Feldman's fraudulent conduct involved "the conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(13)(A). Twice, Feldman convinced the fourth patient not to pursue alternatives to traveling to the Philippines for a liver transplant. The patient was uncertain about traveling to the Philippines, and when he did and received the advice of Philippine doctors to leave, Feldman again convinced him that he would receive a successful transplant in the Philippines. For a man in desperate need of a liver transplant, Feldman's fraudulent and baseless assertions that he could arrange a transplant created a high risk that the patient would die or be seriously injured. The patient wasted precious time at the end of his life in a hospital with no chance of a transplant, preventing him from traveling to a different country to receive a transplant or returning home to his treating physicians and family. *Cf. United States v. Moon*, 513 F.3d 527, 541-42 (6th Cir. 2008) (affirming enhancement where doctor, despite charging patient's insurance for full chemotherapy doses, provided patient only partial doses, knowing that such doses would increase the patient's risk of death from cancer). Feldman was conscious of the risk to the fourth patient's health – and life – but was more interested in prying as much money as possible from the patient and his wife – $70,000 in total. The district court did not err in applying this enhancement.

**D.**

Feldman also challenges the district court's finding that he obstructed justice. Section 3C1.1 provides for a two-level increase in the offense level where:

> (A) the defendant willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and
> (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1.

The section applies where a defendant willfully fails to appear for a judicial proceeding. *Id.*, Application Note 4(E); *see also United States v. Carty*, 264 F.3d 191, 195 (2d Cir. 2001) (obstruction adjustment applicable where defendant fled to and remained in foreign country to avoid judicial proceeding); *United States v. Reed*, 88 F.3d 174, 178 (2d Cir. 1996) ("[C]ertain conduct, such as intentionally failing to appear as required at judicial proceedings, is so inherently obstructive of the administration of justice that it is sufficient that the defendant willfully engaged in the underlying conduct, regardless of any additional purpose.").

Here, Feldman fled from Florida to the Philippines after pleading guilty to committing the JFC Center false claims fraud. First, by fleeing to the Philippines and remaining there as a fugitive, Feldman willfully obstructed the investigation and prosecution of an "instant offense of conviction," namely the Second Chance in Life fraud, which Feldman committed before he fled Florida. Feldman escaped prosecution for that fraud for the full decade he lived as a fugitive in the Philippines. *Cf. United States v. Loeb*, 45 F.3d 719, 722 (2d Cir. 1995) (affirming obstruction enhancement where defendant fled jurisdiction and remained a fugitive for 39 days). Second, the obstructive conduct related to both an "offense of conviction" – the Second Chance in Life fraud – and "relevant conduct" to that offense – the JFC Center false claims fraud.

Feldman objects to this enhancement, arguing that it cannot be applied unless the obstructive conduct "occurred during the investigation or prosecution" of the Second Chance in

-25-

Life fraud or liver4you.org fraud. However, as of November 1, 2006, Section 3C1.1 did not require obstruction "during the course of" an investigation or prosecution. Rather, the enhancement applied to obstruction "with respect to" an investigation or prosecution. U.S.S.G. § 3C1.1. As the Sentencing Commission's Application Note explains, "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *Id.*, Application Note 1; *see also* U.S.S.G. Supp. App. C, Amend. 693 (discussing November 2006 amendment).

Section 3C1.1, as revised on November 1, 2006, applies here. On November 1, 2006, and for 27 months thereafter, Feldman obstructed justice by remaining a fugitive in the Philippines, impeding the investigation and prosecution of his Second Chance in Life fraud. Feldman engaged in his Second Chance in Life fraud only after he could no longer fraudulently obtain Medicare funds through the JFC Center. When he was prosecuted for the JFC Center fraud, and with the Second Chance in Life fraud still undiscovered by federal authorities, Feldman fled to the Philippines. Given these facts, the district court did not clearly err in finding that Feldman's conduct was purposefully calculated and likely to thwart the investigation or prosecution of his Second Chance in Life fraud.

Feldman objects to the enhancement for two additional reasons, both of which can be dismissed summarily. First, Feldman argues that the JFC Center false claims fraud was not "relevant conduct," but we rejected that argument in Section III.C. Second, Feldman argues that his conduct was not obstructive, even though we repeatedly have held to the contrary. *E.g.*, *Carty*, 264 F.3d at 195; *Reed*, 88 F.3d at 178.

In sum, the district court did not err in applying the obstruction of justice enhancement.

## IV.

Lastly, Feldman challenges the substantive reasonableness of his 188-month sentence. Under the parsimony clause of 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a)(2). In "exceptional" cases, "where the trial court's decision cannot be located within the range of permissible decisions," this Court may overturn a procedurally reasonable sentence as substantively unreasonable. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted).

On this record, we cannot say that the district court's sentence was outside the range of permissible decisions. Feldman's sentence was within the Guidelines range and the district court stated that it weighed the relevant considerations and the seriousness of Feldman's offenses. The court stated that Feldman committed "egregious" conduct that inflicted "terrible tragedies" upon his victims and reflected a "gross disregard for suffering" and an "indifference to the healthcare of seriously sick people." Repeatedly, and seemingly without remorse, Feldman convinced desperately ill people to travel to the Philippines on the promise of an organ transplant, even though Feldman knew he could not deliver. Feldman did so, as he acknowledged in an email to his wife, to "push" his victims for more money. Given Feldman's egregious criminal conduct, we cannot say that the district court's 188-month sentence falls outside "the range of permissible decisions." *Cavera*, 550 F.3d at 189.

## V.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.