10-0065-cr
United States v. Coppola

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

────────────

August Term, 2010

(Argued: May 20, 2011     Decided: February 14, 2012)

Docket No. 10-0065-cr

────────────

UNITED STATES OF AMERICA,

*Appellee*,

v.

MICHAEL COPPOLA,

*Defendant-Appellant*.

────────────

Before:

RAGGI, LYNCH, and WALLACE, *Circuit Judges*.[*]

────────────

On appeal from a judgment of conviction for substantive and conspiratorial racketeering entered after trial in the United States District Court for the Eastern District of New York (Gleeson, *Judge*), defendant Michael Coppola challenges (1) the legal validity of the extortion and wire fraud subpredicates comprising Racketeering Act One, particularly after Skilling v. United States, 130 S. Ct. 2896 (2010); (2) the sufficiency of

────────────

[*] Judge J. Clifford Wallace of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

the evidence to prove any of the Racketeering Act One subpredicates; (3) the sufficiency of the evidence to prove the pattern element of racketeering; (4) various evidentiary rulings; (5) the jury charge; and (6) the reasonableness of his sixteen-year prison sentence.

AFFIRMED.

———————

ROBERT A. CULP, Esq., Garrison, New York, *for Defendant-Appellant.*

AMY BUSA (Peter A. Norling, *on the brief*), Assistant United States Attorneys, *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee.*

———————

REENA RAGGI, *Circuit Judge*:

Defendant Michael Coppola was found guilty after a jury trial in the United States District Court for the Eastern District of New York (John Gleeson, *Judge*) of conducting and conspiring to conduct the affairs of the Genovese organized crime family through a pattern of racketeering activity evidenced by the use of extortion and fraud to control the New York–New Jersey waterfront generally and International Longshoreman's Association ("ILA") Local 1235 in particular, and by the possession of false identification documents. See 18 U.S.C. § 1962(c), (d). On this appeal from the December 31, 2009 amended judgment of conviction sentencing him to concurrent terms of sixteen years'

incarceration, Coppola challenges (1) the legal validity of the extortion and wire fraud subpredicates charged as Racketeering Act One, particularly after Skilling v. United States, 130 S. Ct. 2896 (2010); (2) the sufficiency of the evidence to prove any of these subpredicates; (3) the sufficiency of the evidence to prove the pattern element of racketeering; (4) various evidentiary rulings; (5) the jury charge; and (6) the reasonableness of his sentence. For the reasons stated herein, we reject these arguments and affirm the judgment.

## I.     **Background**

### A.     The Crimes of Conviction

Coppola was convicted on a two-count superseding indictment charging him with substantive and conspiratorial racketeering in connection with his activities over three decades as an associate, soldier, and ultimately captain of the Genovese organized crime family, one of the five arms of La Cosa Nostra in the New York metropolitan area.[1] The pattern of racketeering through which Coppola was alleged to have conducted and participated in the affairs of the Genovese family was charged in three predicate acts.

Racketeering Act One alleged conspiracy to extort, extortion, and wire fraud in connection with the Genovese family's control of ILA Local 1235. See 18 U.S.C. §§ 1343, 1346, 1951(a), (b)(2). As to the extortion subpredicates, the indictment charged

---

[1] In New York, La Cosa Nostra has traditionally operated through five organized crime families: Bonanno, Colombo, Gambino, Genovese, and Lucchese. See United States v. Eppolito, 543 F.3d 25, 28 (2d Cir. 2008); accord United States v. Basciano, 599 F.3d 184, 188 n.1 (2d Cir. 2010).

3

that between January 1974 and March 2007, Coppola and others obtained or conspired to obtain the property of Local 1235 members both in the tangible form of "Local 1235 labor union positions, money paid as wages and employee benefits and other economic benefits that such Local 1235 union members would have obtained but for the defendant and his co-conspirators' corrupt influence over such union," and in the intangible form of "the right of Local 1235 members to have the officers, agents, delegates, employees and other representatives of their labor organization manage the money, property and financial affairs of the organization in accordance with Title 29, United States Code, Section 501(a)." Indictment ¶¶ 16, 19.[2] The property was allegedly obtained with the consent of union officials "induced by wrongful use of actual and threatened force, violence or fear." Id.

As to the wire fraud subpredicate of Racketeering Act One, the indictment charged that between January 1974 and March 2007, Coppola and others devised a scheme to defraud Local 1235 union members of (1) the same tangible property charged in the extortion subpredicates, and (2) intangible property in the form of "the right of the honest services of the Local 1235 Presidents." Id. ¶ 20. The particular use of wires charged to execute the scheme was an interstate telephone conversation between Coppola and an unindicted confederate, Edward Aulisi, on March 6, 2007.

---

[2] Although the indictment also charged extortion of "the right of Local 1235 union members to free speech and democratic participation in the affairs of their labor organization," Indictment ¶¶ 16, 19, that theory was not submitted to the jury, and we discuss it no further.

4

Racketeering Act Two charged Coppola with the April 10, 1977 attempted and actual murder of Giovanni Larducci, also known as "John Lardiere" and referred to as such in the record. See N.J. Stat. Ann. §§ 2A:113-1, 2A:113-2 (1977).

Racketeering Act Three alleged that between August 1996 and March 2007, Coppola conspired to possess with intent to use various false identification documents. See 18 U.S.C. § 1028(a)(3), (f).

Because the jury found only the first and third predicates proved, our factual discussion focuses on these matters, with the evidence viewed in the light most favorable to the verdict. See, e.g., United States v. Jass, 569 F.3d 47, 50 (2d Cir. 2009).

B.    Trial Evidence

The government adduced extensive evidence of the Genovese family's criminal control over the Manhattan and New Jersey waterfronts generally and over Local 1235 in particular. Genovese family member George Barone, Genovese associate Michael D'Urso, Gambino family member Primo Cassarino, and Lucchese family member Thomas Ricciardi testified that mob control over the metropolitan area waterfront dated from the 1950s, with an understanding between the Genovese and Gambino families that the former enterprise would dominate unions and businesses operating on the Manhattan and New Jersey docks, while the latter enterprise dominated unions and businesses operating in Brooklyn and Staten Island. Asked how such control was exercised, Barone replied, "intimidation, fear, whatever." Trial Tr. at 1114. While much of Barone's

testimony focused on mob dominance of Manhattan-based ILA Local 1804-1, which was eventually exercised by Coppola and his one-time Genovese captain, Tino Fiumara, the totality of the evidence demonstrated that intimidation and fear was the common scheme or plan used by the Genovese family to secure and maintain waterfront control. In a recorded conversation, Local 1804-1 vice-president Thomas Buzzanca stated that "everybody fears and respects [Fiumara]," and "we all live under[] fear." Gov't Ex. TR-CD-5b at 1–2, 5 (emphasis added).

Evidence showed that the Genovese family used its control of unions to dictate what businesses worked on the waterfront. D'Urso explained that if an "ordinary guy" wanted to go into the trucking business on the docks, or wanted to open up something on the docks" the Genovese family would "sic the union on the them." Trial Tr. at 877. In short, because the Genovese family "ran the union[s]," it "could bring [a legitimate] business to a screeching halt." Id.; see also Gov't Ex. TR-CD-3 (T1).

Robert Delaney, a New Jersey State police officer who had participated in an undercover investigation of organized crime on the New Jersey waterfront in the 1970s, corroborated this account with particular reference to Coppola. Delaney testified that while he was posing as the owner of a trucking company, Coppola had represented that he and Fiumara, through "contacts," could provide "labor peace on the waterfront where [Delaney's] trucks were picking up containers." Trial Tr. at 148. Such peace, however, came at a price in the form of "tribute" payments that the Genovese family demanded

6

from both waterfront businesses and unions, payments that Barone testified generated "millions" of dollars in income for the enterprise. Id. at 1103. Officer Delaney testified that Coppola and Fiumara had required him to pay a percentage of his trucking profits to them in return for getting business on the waterfront and operating without labor disturbances: "We made percentage and cut payments based on the earnings that the company made . . . . to Mr. Fiumara's group." Id. at 143. D'Urso, who acknowledged collecting tribute payments for the Genovese family, explained that monies extorted from businesses were sometimes channeled to the enterprise through the unions: "[V]endors who have businesses on the docks" would pay "handouts[,] . . . contributions, shakedowns, whatever. . . . They want to get something done they pay off maybe one of the [union] presidents or somebody close to him, find a way to get this stuff down and expedite it quickly." Id. at 884. Barone confirmed the practice, testifying that Burt Guido, whose business operated on the waterfront, made regular tribute payments to Local 1804-1 officials, who would pass the payments on to Barone.

In addition to monthly tribute payments, the Genovese family demanded "Christmases," special year-end payments from waterfront businesses and unions. D'Urso stated, "during Christmas, people show their appreciation . . . . [L]egitimate businesses that you help, they usually put together a Christmas package for you . . . . It's a tribute payment." Id. at 882. The practice was evidenced, inter alia, by a December 12, 1978 recorded conversation between Local 1804-1 vice president Buzzanca and William

7

Montella, the owner of a waterfront business called Quinn Marine, in which Montella told Buzzanca that he had a $2,000 tribute payment and a $5,000 "Christmas" payment for Fiumara. Also, a March 14, 2001 videotape of a meeting between Genovese confederates D'Urso and Cafaro shows the two men discussing Barone's demand for a $90,000–$100,000 "Christmas" payment from Andrew Gigante, another waterfront business owner.

With respect to the Genovese family's extortion of labor unions under their control, a recorded September 14, 1998 conversation shows enterprise confederate Stephen DePiro telling Fiumara, "Christmas time I want double. . . . I don't want [union official] Brief saying, like no 2%, this, this is the way it's going to be. . . . [H]e's got all his guys that he works there. Bring us double and that's that." Gov't Ex. TR-CD-6b at 17.[3] Further, Officer Delaney testified that Genovese family member Larry Ricci told him that he collected regular $15 payments from waterfront union members for the enterprise under the guise of a dental plan. When one union member indicated an expectation that his dental bills would therefore be covered, Ricci employed classic extortion techniques to set the member straight: he "hit the guy in the chest" and told him "the dental plan is there to keep your own f---ing teeth." Id. at 152. Lucchese member

---

[3] Based on other recorded conversations in which Fiumara stated that he wanted "Brief" to obtain a "C-card" for someone—a type of seniority card held by ILA union members—the jury reasonably could have concluded that Brief was a union official and that DePiro's demand for a larger "Christmas" from Brief and "all his guys that he works there," referred to a demand for tribute money from union members.

Ricciardi testified that his brother-in-law, William Bell, a New Jersey longshoreman, was required to pay $500 to the Genovese family in order to be called for work on the docks.

With particular reference to Local 1235, the evidence showed Genovese family control of that union for more than thirty years through three successive local presidents: Vincent Colucci, also known as "Cong" (1975–80); Albert Cernadas, also known as "Bull" (1981–2006); and Vincent Aulisi, also known as "Vet" or "Pop" (2006–09). Barone testified that Colucci was the first to "gang[] up his association with us, the Mafia." Trial Tr. at 1144. Thereafter, Barone himself put Cernadas "'on record' with the Genovese family," id. at 1145, whereupon Cernadas "[a]lways, always" went along with Genovese demands, id. at 1270. Barone stated that he advised Cernadas "to be associated with Tino [Fiumara] and Michael [Coppola]" because "there was the power in that area of the Mafia." Id. at 1145. That Cernadas paid tribute over the years to these members of the Genovese family is evidenced by a recorded March 6, 2007 conversation between Coppola and Edward Aulisi, whose father Vincent Aulisi had succeeded Cernadas as Local 1235 president the previous year. At the time of this conversation, Coppola was subject to a 1991 court order prohibiting him from having any dealings "whatsoever" with any officer, member, or employee of the ILA or a related labor organization such as Local 1235. See Default Judgment, United States v. Local 1804-1, Int'l Longshoremen's Ass'n, AFL-CIO, 90-cv-963 (S.D.N.Y. Sept. 5, 1991). Nevertheless, Coppola received the younger Aulisi's assurances, on behalf of his father, that Local 1235 would continue

9

to pay monthly tribute and "Christmases" to the Genovese family despite seemingly contrary statements by Cernadas as he was leaving office:

Aulisi: Ohh, and the Vet [i.e., Vincent Aulisi] told me to pass it on. Umm. What the hell did he say to me? Ohh, that, ah, he was glad that, ah, the other, the Cuban, that Ricky Ricardo, was there when this guy [i.e., Cernadas] made mention hey, once I'm outta, once I'm gone from here, this thing stops. So Mike, [laughs] the Vet said, this thing stops? The beat goes on, whether you're here or not. But, Ricky Ricardo was there when he said, he said it.

Coppola: Who, who?

Aulisi: He said I, want you to relay that.

Coppola: Which guy? Who said that?

Aulisi: The Bull [i.e., Cernadas]. You know when this is gone, when I'm gone, he says this thing is gonna end. Meaning, meaning ahh, the month, you know, the the Christmases, and everything else, he [i.e., Vincent Aulisi] says what you talking about?

Coppola: Yeah, yeah.

Aulisi: This gonna, things gonna go on.

Gov't Ex. TR-CD-7 (T6) at 6. Then, still with reference to tribute payments, the younger Aulisi stated that his father wanted him to tell Coppola that "this thing almost, almost doubled." Id.

Another recorded conversation between Edward Aulisi and Coppola the same day showed Coppola asking about the amounts collected and Aulisi acknowledging Coppola's

10

control over their disposition. Aulisi reported receiving "another chunk," and stated that he knew Coppola was "directing that to the other half." Gov't Ex. TR-CD-7 (T7) at 1. In response to Coppola's query as to "how many months" of payment Aulisi had obtained, Aulisi replied "we're gonna have three." Id. at 2. He stated that one person had given him "sixty something and then he just gave me . . . twenty-eight hundred," but "there ain't gonna be nothing [more] there." Id. Coppola stated that he was "not worried about that because I told him to take whatever he had to take for the other, ah, for the other situation. So I knew it was gonna be down to nothin'." Id. at 3.

Evidence also showed that the Genovese family exploited its control over waterfront unions to make union employment decisions. Barone testified that the Genovese family "sen[t] word" to ILA president John Bowers to put Harold Daggett into a senior position with the union. Trial Tr. at 1119. The Genovese family then "told [Daggett] what we wanted him to do. . . . If he didn't do it, we take him out." Id. at 1117. Barone testified that he personally secured union employment for numerous Genovese associates, including positions at an ILA health care clinic for Coppola's brother and Cernadas' wife. Officer Delaney testified that Genovese member Ricci told him that he held a union job that paid him "$45,000 a year . . . and all he had to do was put his feet on the desk, the only time he worked [was] if the other guy [i.e., Fiumara] called him for something." Trial Tr. at 150.

11

In the first of their March 6, 2007 conversations, Coppola and Edward Aulisi discussed past and future placement of friends and family in Local 1235 positions, with Coppola making clear his ability to exercise a final say. Referencing a time when Colucci "wanted to leave his wife" in a union position, Coppola stated, "we were right next to him all the time during this whole thing," and "[w]e said under no circumstances." Gov't Ex. TR-CD-7 (T6) at 7–8. As to another placement of someone's daughter, Coppola told Aulisi, "I sent . . . word back, under no circumstance." Id. at 8. And as to a placement then under consideration, Coppola instructed the younger Aulisi to tell his father, "[i]t's, it's, not gonna happen to, you relay that to, to, Pop that's all." Id. at 9. Moments after concluding this call, Coppola again spoke with Edward Aulisi, reiterating, "you let him be aware of that, that's not gonna happen." Gov't Ex. TR-CR-7 (T7) at 1.

Evidence showed that Coppola's racketeering activities persisted through March 2007, not only despite the 1991 court order, but also despite his status as a fugitive from an August 8, 1996 subpoena ordering him to provide a DNA sample to New Jersey authorities investigating the Lardiere murder. Coppola was able to avoid apprehension and continue overseeing enterprise activities because organized crime confederates provided him with both money and false identification documents. D'Urso testified that while Coppola was "on the lam, on the run," Trial Tr. at 860, the Genovese family had money delivered to him by Thomas Cafaro and Chuck Tuzzo. Meanwhile, in recorded February 2007 conversations, Coppola's son-in-law Louis Rizzo reported that he had

12

secured "the BC [i.e., birth certificate] and the SS [i.e., Social Security card]" for Coppola, Gov't Ex. TR-CD-7 (T1) at 1, as well as a credit card, but needed more time to obtain a fraudulent driver's license. A month later, at the time of Coppola's March 9, 2007 arrest, he was in possession of a New York identification card, a Blue Cross insurance card, as well as various credit and debit cards in the name "José Quinones." Meanwhile, a search of Coppola's New York apartment yielded credit cards and identification documents bearing the names Michael Rizzoli, Joseph Rizzoli, Joseph Carro, Hector Carro, and Olga Quinones, and thousands of dollars in cash.[4] A search of Coppola's San Francisco apartment yielded bank records in the names Joe Quinones and José Quinones and thousands of dollars in cash.

## C. Verdict and Sentence

In finding Coppola guilty of both racketeering and racketeering conspiracy, the jury indicated with specific reference to Racketeering Act One that it found extortion, extortion conspiracy, and wire fraud proved. The jury further indicated that it found the wire fraud subpredicate proved under both theories charged, i.e., a scheme to defraud Local 1235 members of tangible property and a scheme to defraud Local 1235 members of the honest services of their union's presidents. The district court rejected pre- and post-verdict challenges to Racketeering Act One, as well as to the sufficiency of the evidence to prove the pattern element of racketeering.

---

[4] Because Coppola's wife joined him after he became a fugitive, she too was in need of fraudulent identification to avoid providing leads to her husband's whereabouts.

In calculating Coppola's Guidelines range at sentencing, the district court determined that the total offense level for the extortion subpredicates was 29, while the total offense level for the wire fraud subpredicate was 30,[5] grouping the offenses to yield a total offense level of 30.[6] The district court declined to apply an obstruction of justice enhancement, see U.S.S.G. § 3C1.1, to its calculation of either the extortion or fraud offense levels, invoking United States v. Agudelo, 414 F.3d 345, 350 (2d Cir. 2005) (cautioning against assumption that defendant who submits affidavit to justify suppression hearing is automatically subject to obstruction enhancement if suppression

[5] The curious result of fraud having a higher total offense level than extortion arises from the following Guidelines calculation. With respect to the extortion crimes, the Guidelines provided for a base offense level of eighteen, see U.S.S.G. § 2B3.2(a); a two-level enhancement for the implied threat of bodily injury, see id. § 2B3.2(b)(1); a six-level enhancement for a total loss of more than $2.5 million, see id. § 2B3.2(b)(2) (cross-referencing § 2B3.1(b)(7)(G)); and a three-level enhancement for role in the offense, see id. § 3B1.1(b). With respect to the fraud crimes, the Guidelines provided for a base offense level of seven, see id. § 2B1.1(a)(1); an eighteen-level enhancement for a total loss of more than $2.5 million, see id. § 2B1.1(b)(1)(J); and a three-level enhancement for role in the offense, see id. § 3B1.1(b). What afforded fraud a higher Guidelines range than extortion in this case was a further two-level enhancement for commission of the crime in violation of a court order. See id. § 2B1.1(b)(8)(C) (renumbered in 2011 to § 2B1.1(b)(9)(C)). While the record suggests that the district court reasonably thought that this fact should also raise Coppola's extortion offense level, see Sentencing Tr. at 13, the extortion Guideline contains no parallel provision to § 2B1.1(b)(8)(C), and the total offense level of 29 employed for extortion does not reflect any court-order-violation enhancement. We have no occasion here to discuss whether the factor might support a Guidelines departure or the imposition of a non-Guidelines sentence, as the district court did not so support the challenged sentence.

[6] In grouping the offenses pursuant to U.S.S.G. § 3D1.2, the district court persuaded the government to abandon its argument that grouping analysis did not apply to extortion offenses, previewing its intent to impose a non-Guidelines sentence in stating, "[n]othing hinges on this particular ruling." Sentencing Tr. at 15.

14

motion is denied). It also declined to apply the higher offense level of 43 that would derive from treating the Lardiere murder as relevant conduct, explaining that, while there was probable cause to think Coppola had committed the murder, it did not find the crime proved by a preponderance of the evidence.[7] Cf. United States v. Vaughn, 430 F.3d 518, 526 (2d Cir. 2005) (Sotomayor, J.) (recognizing that court may use acquitted conduct to calculate Guidelines range when found by preponderance of evidence).

In explaining its application of a loss amount of at least $2.5 million to calculate the extortion and fraud offense levels, the district court specifically declined to aggregate the salaries paid to Local 1235 presidents from 1975 to 2007, as urged by the prosecution and recommended by the Probation Department. See Sentencing Tr. at 7–8 (rejecting salary aggregation as "very clumsy way to estimate loss" in Coppola's case). Instead, it assessed loss by reference to the revenues realized by the Genovese family as a result of its corrupt control of Local 1235. See id. at 8 (observing that for the 33 years at issue in the case "[t]his union local and the members it was supposed to represent was a cash generating machine for the Genovese family"). Without attempting to calculate these revenues precisely, the district court noted that they allowed the defendant "to maintain an apartment in San Francisco and an apartment in New York's West Side for the 11

---

[7] The district court stated, "[i]t is hard to fathom why [Coppola] would choose to become a fugitive back in 1996 or so, when he fled, unless he thought the DNA evidence would implicate him [in the Lardiere murder] . . . . It is hard to fathom why he would think his own DNA would implicate him unless he was there, but I don't think that's enough to prove the murder by a preponderance of the evidence." Sentencing Tr. at 5–6.

15

years he was a fugitive." Id. at 9.[8] Further, Coppola "was hardly the only person the evidence showed that benefitted from the cash cow that Local 1235 was to the Genovese family." Id. Thus, the court concluded that it did not even need to consider Coppola's involvement in the broader conspiracy, which extorted still other waterfront unions and businesses. "It is sufficient for me to say that even focusing only on Local 1235, the 2.5 million amount is, to put it mildly, an extremely conservative estimate." Id.

Relying on a total offense level of 30 and a criminal history category of IV, the district court determined that Coppola's advisory Guidelines range provided for a 135-to-168-month term of incarceration. The district court nevertheless invoked its discretion to impose a more severe non-Guidelines sentence, explaining that the racketeering Guidelines failed to "capture the significance of the crime," particularly Coppola's racketeering crime, which "was committed by the defendant as a member of the Genovese family, an organized crime family." Id. at 31–32. The district court specifically faulted the racketeering Guidelines for not doing "anything but funnel[ing]" a sentencing court into the Guidelines applicable to the predicates, which could be committed in "any number of ways, . . . some of which have nothing to do with sustained criminal activity." Id. at 32. The district court emphasized that Coppola's racketeering crime spanned "more than 30 years" and that "criminal conduct was Mr. Coppola's livelihood. It is what he did." Id. Further, Coppola chose to pursue his "lifetime occupation" of crime "as part of an

---

[8] At the time of his arrest, Coppola and his wife were living in an eleventh floor apartment of a sixteen-story pre-war building located at 74th Street and Amsterdam Avenue.

organization that gave him enormous additional power . . . derive[d] from a well grounded fear that if you cross a member of that organization you will be killed." Id. at 32–33. This was why the Genovese family in general, and "Mr. Fiumara, this defendant, the others associated with him" in particular, "were so successful." Id. at 33.

Finding the Guidelines "woefully insufficient . . . to capture the essence" of the racketeering crimes of conviction, id. at 34, the district court sentenced Coppola to concurrent prison terms of 192 months, i.e., sixteen years, to run consecutive to an undischarged 42-month prison term imposed on a related conspiracy charge of harboring a fugitive (himself), see 18 U.S.C. §§ 371, 1071, to which Coppola had earlier pleaded guilty, see Judgment, United States v. Coppola, 07-cr-225 (DLI) (E.D.N.Y. May 14, 2008), ECF No. 77.

This timely appeal followed.

## II.   Discussion

### A.   Racketeering Act One

Coppola contends that his conviction must be reversed because the alleged subpredicate acts comprising Racketeering Act One (1) fail to state extortion or mail fraud offenses, particularly after Skilling v. United States, 130 S. Ct. 2896; and (2) were not proved by sufficient evidence.

We review Coppola's first challenge de novo. See, e.g., United States v. Gotti, 459 F.3d 296, 320 (2d Cir. 2006). Because the jury returned findings of guilt on each of the

17

identified subpredicate acts, we will uphold the jury's finding that Racketeering Act One was proved if any one of the identified subpredicate acts—extortion conspiracy, extortion, or wire fraud (whether to obtain tangible property or intangible property in the form of honest services)—states an offense. See United States v. Ruggiero, 726 F.2d 913, 922–23 (2d Cir. 1984), abrogated on other grounds by Salinas v. United States, 522 U.S. 52, 61–62 (1997); see also id. at 925–28 (Newman, J., concurring in part and dissenting in part).[9] Where, however, the jury returned a general verdict as to any subpredicate act charged under multiple theories, we can uphold the jury's finding as to that subpredicate act only if every charged theory states an offense, see Yates v. United States, 354 U.S. 298, 312 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1, 8–10 (1978); United States v. Salmonese, 352 F.3d 608, 624 (2d Cir. 2003), unless the pleading error was harmless, see Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008); accord Skilling v. United States, 130 S. Ct. at 2934 n.46 (extending Hedgpeth harmlessness principle beyond habeas review).

As to Coppola's sufficiency challenge, we will uphold the jury's finding as to Racketeering Act One if the evidence was sufficient to prove any one of the subpredicate acts on any legally valid theory charged. See, e.g., Griffin v. United States, 502 U.S. 46, 56–57 (1991); United States v. Salmonese, 352 F.3d at 624. While we make this

_____

[9] In fact, the government does not defend the honest services theory of the wire fraud subpredicate, which was not charged to require proof of the bribe-kickback element identified in Skilling, 130 S. Ct. at 2907.

18

determination <u>de novo</u>, we view the evidence in the light most favorable to the verdict, and we will reverse only if we conclude that no reasonable jury could have found guilt beyond a reasonable doubt.  See, e.g., <u>United States v. Heras</u>, 609 F.3d 101, 105–06 (2d Cir. 2010).

Applying these principles to this case, our analysis can begin and end with the extortion subpredicates, which state a viable offense and are supported by sufficient evidence.

### 1.    Validity of Extortion Subpredicates

To charge extortion under the Hobbs Act, an indictment must allege that a defendant obtained (or in the case of conspiracy, schemed with others to obtain) property from another with his consent induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right.  <u>See</u> 18 U.S.C. § 1951(a), (b)(2).[10]  In this case, the indictment charged Coppola with obtaining and conspiring to obtain both intangible and tangible property from Local 1235 union members, with the consent of union officials induced by the wrongful use of threats and fear.

### a.    The Intangible Property Theory

The government's intangible property theory was based on a provision of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), Pub. L. No. 86-257, 73 Stat. 519, stating that the officials of a labor organization "occupy positions of

---

[10] Because "color of official right" was not at issue in this case, we do not reference that means of extortion further.

trust in relation to such organization and its members as a group." 29 U.S.C. § 501(a).

That provision specifies particular duties owed by officials to the union and membership

they serve:

> It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.

Id. Explaining this provision to the jury in this case, the district court charged that "union

members have a right to the loyal service of union officials; and this right constitutes a

form of property." Trial Tr. at 1816.

This instruction conforms to our precedent, which recognizes that the concept of

property under the Hobbs Act reaches beyond tangible property to include union

members' "LMRDA rights to loyal representation by their officers, agents, and other

representatives." United States v. Gotti, 459 F.3d at 325; see also United States v.

Tropiano, 418 F.2d 1069, 1075–76 (2d Cir. 1969) (holding that "concept of property under

the Hobbs Act . . . is not limited to physical or tangible property or things, but includes . . .

any valuable right considered as a source or element of wealth" (citations omitted)).

20

Coppola does not contend that the district court misconstrued Gotti. Rather, he asserts that we must revisit Gotti's holding in light of the Supreme Court's recent decision in Skilling v. United States, 130 S. Ct. 2896.

Skilling was not a Hobbs Act case. It considered a conviction under the "honest services" provision of the wire fraud statute. See 18 U.S.C. § 1346 (defining term "'scheme or artifice to defraud'" to include "scheme or artifice to deprive another of the intangible right of honest services"). To avoid "due process concerns underlying the vagueness doctrine" in the undefined phrase "right of honest services," Skilling v. United States, 130 S. Ct. at 2931; see id. at 2935 (Scalia, J., concurring in part and concurring in judgment), the Supreme Court construed the statutory provision as limited to "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived," id. at 2928 (identifying bribe and kickback schemes as "core" of honest services fraud recognized by appellate courts before McNally v. United States, 483 U.S. 350 (1987)). Coppola argues that there is little difference between the LMRDA rights alleged in this case and the right to honest services at issue in Skilling. He maintains that both are too vague to state a criminal charge consistent with due process. See Appellant Br. at 67 (stating "it makes no sense to posit that the same 'honest services' that are too vague to be defrauded nonetheless can be extorted"). We disagree.

21

First, to the extent Coppola asserts that Skilling identifies vagueness concerns with intangible rights generally, he is mistaken. Skilling addressed a particular intangible right—to honest services—identified, but not defined, by § 1346. It did not identify vagueness concerns with all intangible rights. To the contrary, Skilling held that even the intangible right of honest services can constitutionally be the basis of a wire fraud prosecution when that intangible right is deprived through a bribe or kickback. See 130 S. Ct. at 2928. Thus, nothing in Skilling warrants a conclusion that intangible property rights can no longer support a Hobbs Act extortion or extortion conspiracy charge. See United States v. Cain, --- F.3d ----, 2012 WL 265882, at *5–6 (2d Cir. 2012) (affirming conviction for extortion under Hobbs Act of intangible right to solicit business).

Second, the vagueness concerns identified in Skilling with respect to the § 1346 right to honest services do not translate to the LMRDA rights derived from § 501(a). A statute is not void for vagueness if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983); accord Arriaga v. Mukasey, 521 F.3d 219, 224 (2d Cir. 2008). "This test does not demand meticulous specificity in the identification of proscribed conduct. Rather, it requires only that the statutory language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." United States v. Farhane, 634 F.3d 127, 139 (2d Cir.)

22

(internal quotation marks and citations omitted), <u>cert. denied sub nom.</u> <u>Sabir v. United</u> <u>States</u>, 132 S. Ct. 833 (2011). Additionally, "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." <u>Maynard v. Cartwright</u>, 486 U.S. 356, 361 (1988); <u>accord</u> <u>Arriaga v. Mukasey</u>, 521 F.3d at 223.

In challenging § 501(a) as vague, Coppola notably avoids discussion of the statutory language, a failure that obscures critical textual distinctions between § 501(a) and § 1346. Whereas § 1346 provides no textual guidance about the duties whose violation will amount to a deprivation of "honest services," <u>see, e.g.</u>, <u>Sorich v. United States</u>, 129 S. Ct. 1308, 1310 (2009) (Scalia, J., dissenting from denial of <u>certiorari</u>) (discerning no "coherent limiting principle" defining what "honest services" is, "whence it derives, and how it is violated"), § 501(a) specifically enumerates the duties that labor representatives owe to their union and its members: (1) to hold union money and property solely for the benefit of the union and its members; (2) to manage, invest, and expend union money in accordance with the union's constitution and bylaws and any applicable resolutions; (3) to refrain from dealing with the union as an adverse party or on behalf of an adverse party in any matter connected with the representative's union duties; (4) to refrain from holding or acquiring any pecuniary or personal interest which conflicts with the interests of the union; and (5) to account to the union for any profit received by the representative in whatever capacity in connection with transactions conducted by him or under his direction on behalf

23

of the union.  See 29 U.S.C. § 501(a).  Thus, in contrast to § 1346, which references, at best, only a general and undefined fiduciary standard, see Skilling v. United States, 130 S. Ct. at 2936 (Scalia, J., concurring in part and concurring in judgment), § 501(a) avoids unconstitutional ambiguity by detailing the duties owed and the persons from and to whom they are owed, see Gurton v. Arons, 339 F.2d 371, 375 (2d Cir. 1964) ("A simple reading of [§ 501(a)] shows that it applies to fiduciary responsibility with respect to the money and property of the union and that it is not a catch-all provision under which union officials can be sued on any ground of misconduct with which the plaintiffs choose to charge them.").

Third, while § 501(a) creates the intangible right here at issue, it does not define the predicate crime.  That task is performed by the Hobbs Act, which identifies a crime only when property—including the intangible rights specified in § 501(a)—is obtained by extortion.  The Hobbs Act, unlike § 1346, cannot be construed to proscribe mere self-dealing, that potentially "staggeringly broad swath of behavior," Sorich v. United States, 129 S. Ct. at 1309 (Scalia, J., dissenting from denial of certiorari), that had raised particular vagueness concerns regarding honest services fraud before Skilling, 130 S. Ct. at 2932–33 & n.44 (noting that if Congress wished to criminalize self-dealing, it would have to speak "more clearly than it has," and further noting various concerns with limiting standard proposed by government).  To eliminate that vagueness concern, Skilling cabined honest services fraud to cases in which the breach of duty was procured by the corrupt

24

participation of a "third party" who paid either "bribes or kickbacks" for the breach. See id. at 2928. By contrast, because the principal in a Hobbs Act violation is not the party committing the fiduciary breach, but the person who procures the breach by statutorily specified wrongful means—extortion—the ambiguity concerns with § 1346 are simply not present in the Hobbs Act. The extortion element of the Hobbs Act serves the same limiting function as the bribe-kickback element of § 1346, serving notice that a crime depends on a third party obtaining property through the wrongful use of threats or fear to achieve the property's surrender. Indeed, such extortion with respect to § 501(a) rights fits within the core misconduct that is labor racketeering. See Evans v. United States, 504 U.S. 255, 262–63 (1992) (noting Congress passed Hobbs Act to prohibit labor racketeering).

In sum, we identify nothing in Skilling that warrants a deviation from our holding in Gotti that intangible property, specifically, the LMRDA rights derived from the enumerated duties in § 501(a), can support a valid Hobbs Act extortion charge.

### b. The Tangible Property Theories

The indictment alleged that Coppola obtained and conspired to obtain tangible property from union members in the form of "labor union positions, money paid as wages and employee benefits and other economic benefits" that the union members would have obtained but for the conspirators' "corrupt influence over [the] union." Indictment ¶¶ 16, 19. Through trial and on appeal, the government focused on two tangible property

25

theories: (1) "tribute payments" from membership funds, and (2) "the salary and benefits paid to [Local 1235] presidents who were not living up to their obligations to have the membership in their best interest."  Trial Tr. at 1544.

Coppola does not—and cannot—contend that the extortion of tribute payments from a union by an organized crime family fails to state a viable Hobbs Act offense. Rather, he challenges the viability of the government's "salary theory," i.e., that Coppola obtained tangible property from Local 1235 union members in the form of the salaries they paid to corrupt union presidents.  See Trial Tr. at 1644 (government summation: "When the Mob threatens a union leader to get a union leader to do what it wants, the Mob deprives the union membership [of] the benefit of the salary that they paid that official. The Mob deprives the membership of a union leader who will exercise his rights solely in the interest of the membership of the union.").[11]

In support, Coppola relies on Scheidler v. National Organization for Women, Inc., 537 U.S. 393 (2003), which holds that the use of threats or fear to interfere with or disrupt a person's exercise of property rights is not enough to establish a Hobbs Act violation.  A

_____

[11] We note that this salary theory is somewhat distinct from the variant upheld by a number of courts in the fraud context, where a defendant fraudulently obtains a position and therefore also receives the salary and benefits that come with that position. See, e.g., United States v. Granberry, 908 F.2d 278, 280 (8th Cir. 1990); United States v. Doherty, 867 F.2d 47, 60 (1st Cir. 1989) (Breyer, J.); but see United States v. Ratcliff, 488 F.3d 639, 645 (5th Cir. 2007) (rejecting that theory in election fraud context); United States v. Turner, 465 F.3d 667, 681 (6th Cir. 2006) (same).  We have no occasion to determine whether, as the government urges, this court has implicitly accepted that variant of the "salary theory." See United States v. Schermerhorn, 906 F.2d 66, 69 (2d Cir. 1990); Ingber v. Enzor, 841 F.2d 450, 456 (2d Cir. 1988).

defendant must "obtain" the property for himself. Id. at 405. The government has never claimed that the Genovese family obtained the actual dollars that were supposed to be paid as salary to Local 1235 presidents. Rather, it contends that the enterprise received the loyalty of these presidents without having to pay for it because the presidents were compensated by the union membership. This, Coppola submits, at most alleges the procurement of members' intangible right to their presidents' honest services, a claim that cannot be maintained under either the Hobbs Act or § 1346 after Skilling. Cf. United States v. Goodrich, 871 F.2d 1011, 1013–14 (11th Cir. 1989) (concluding, in fraud context, that similar theory could be maintained only as fraudulent deprivation of intangible rights, not property).

The point merits little discussion because even if we were to agree with Coppola and, further, conclude that Yates v. United States, 354 U.S. at 312, applied to these circumstances, any error would be harmless. See Hedgpeth v. Pulido, 555 U.S. at 58; accord Skilling v. United States, 130 S. Ct. at 2934 n.46. If the jury found that Coppola conspired to extort the salaries of Local 1235 presidents by corrupting them to act in the interests of the Genovese family rather than their membership, then the jury necessarily would have had to conclude that Coppola conspired to extort the union membership of its intangible LMRDA rights under § 501(a).[12] For the reasons stated in the preceding

[12] The Supreme Court in Skilling did not specify the standard applicable to harmless error review in this context. See United States v. Skilling, 638 F.3d 480, 481–82 (5th Cir. 2011) (noting uncertainty and determining whether, on review of record, appellate court could determine beyond reasonable doubt that jury would have convicted on valid ground,

27

section, we conclude that the alleged extortion of such LMRDA rights is validly proscribed by the Hobbs Act even after Skilling. Moreover, as discussed below, the government adduced sufficient evidence to support the jury's finding that Coppola extorted the LMRDA rights of Local 1235 members.

We thus reject Coppola's challenge to the validity of Racketeering Act One.

2.      Sufficiency of Evidence To Prove Extortion Subpredicates

Coppola challenges the sufficiency of the evidence to support the jury's conclusion that (a) he obtained and conspired to obtain tangible or intangible property from Local 1235 members; (b) with consent; (c) through the wrongful use of actual or threatened fear or violence. The record defeats his arguments.

a.      Property Obtained from Local 1235 Members

The recorded March 6, 2007 conversations between Coppola and Edward Aulisi provide direct evidence that Coppola obtained and conspired to obtain property belonging to the members of Local 1235 for the benefit of the Genovese family. The conversations indicate that the property at issue was both tangible, insofar as Coppola received monies belonging to the union membership, and intangible, insofar as he deprived members of their § 501(a) right to have union presidents hold union "money and property solely for the

---

citing Neder v. United States, 527 U.S. 1, 19 (1999)); United States v. Black, 625 F.3d 386, 392 (7th Cir. 2010) (asking whether reasonable jury might have convicted on invalid theory but acquitted on valid theory). We need not decide this question, because the error here would be harmless under any conceivable standard. Proof of extortion under the salary theory necessarily establishes the facts required to show extortion of LMRDA rights.

28

benefit of the organization and its members" and obtained for himself the right to dispose of such money and property for the benefit of the Genovese family.

In reaching this conclusion, we assume that the jury interpreted certain coded terms to reference three Local 1235 presidents: (1) "the Vet" referenced then-Local 1235 president, Vincent Aulisi, based on the context of the conversation as well as the fact that Vincent Aulisi's initials, "VA," are an acronym for the Veterans Administration; (2) "Cong" referenced Vincent Colucci, based on Coppola's statements that Cong had "the same name" as the younger Aulisi's "Pop," i.e., "Vincent," and "was the first one," i.e., the first Local 1235 president to align the union with the Genovese family, as testified to by Barone, Gov't Ex. TR-CD-7 (T6) at 7;[13] and (3) "Bull" referenced outgoing Local 1235 president Albert Cernadas, based on Coppola's statement that a party was being thrown for him, which was corroborated by agent testimony.

With this understanding, a reasonable jury could have found that, in the March 6 conversations, the younger Aulisi was conveying to Coppola his father's assurances that Local 1235 would continue to make tribute payments to the Genovese family. Edward Aulisi reported to Coppola that outgoing Local 1235 president Cernadas had made statements suggesting that "month[ly]" payments and "Christmases" were "gonna end" when he stepped down as president. Gov't Ex. TR-CD-7 (T6) at 6. By themselves, such

---

[13] As the government argued, the inference was reinforced by the fact that Colucci's initials, "VC," were a common acronym for the Viet Cong, sometimes called simply "the Cong." The Vietnam War ended in 1975, the first year of Colucci's presidency.

statements confirmed that Coppola and the Genovese family had obtained membership money in the past. The younger Aulisi, however, went further, stating that his father had told Cernadas that he was wrong about the payments ending: "[T]he beat goes on, whether you're here or not." Id. Indeed, Edward Aulisi told Coppola that payments not only would continue, but also that amounts collected had "almost doubled," id., and that he had "another chunk" for Coppola, representing approximately three months' payments, Gov't Ex. TR-CD-7 (T7) at 1–2. These statements permitted the jury to find that Coppola was involved in a continuing scheme to obtain union members' tangible and intangible property.

In urging a different view of the March 6 conversations, Coppola submits that the government's interpretation of coded references and its assertion that the conversations concerned money payments were uncorroborated. In any event, Coppola asserts that, even if the conversations did reference money payments, the source was not necessarily Local 1235 membership funds. The payments could as easily have come from Edward Aulisi's trucking business or from Vincent Aulisi's personal funds.

The argument is not convincing. As our discussion of code names in the March 6, 2007 conversations demonstrates, the references are not as obscure as Coppola urges. Nor are the interpretations and inferences urged by the government so speculative as to preclude adoption by a reasonable jury familiar with the totality of the evidence. Indeed, the inferences are entirely consistent with the totality of the evidence, which established

30

the common scheme or plan employed by the Genovese family to control substantial parts of the New York–New Jersey waterfront and to extort millions of dollars from businesses and unions alike through fear. Insofar as Coppola hypothesizes alternative sources for the monies paid, we are "mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court." United States v. Florez, 447 F.3d 145, 154–55 (2d Cir. 2006). Coppola was free to argue—and in fact did argue—alternative inferences in urging the jury to interpret the March 6 conversations narrowly in his favor, but we cannot conclude that a reasonable jury was compelled as a matter of law to adopt Coppola's arguments.

Assuming, as we must, that the jury drew the inferences permissibly urged by the government, we conclude that the March 6 conversations provide direct evidence that Coppola had obtained and conspired to obtain tangible property in the form of Local 1235 membership monies and intangible property in the form of the members' § 501(a) right to have union presidents dispose of that money for the sole benefit of members and the union, not for the benefit of the Genovese family. This part of Coppola's sufficiency challenge, therefore, fails on the merits.[14]

---

[14] We note that, as further evidence that Coppola extorted union members' § 501(a) rights to have Local 1235 presidents dispose of union property for their benefit rather than that of the Genovese family, the government points to parts of the March 6, 2007 conversations indicating that Coppola had made and was continuing to make final decisions regarding certain union job placements. Coppola counters that the statements show that he prevented Local 1235 presidents from engaging in nepotism, conduct that did not violate union members' rights but rather protected them. This misses the point. A jury could reasonably conclude that if Coppola exercised control over union presidents' job decisions

b.    Consent

Coppola contends that the evidence was insufficient to satisfy the Hobbs Act's consent element because the victims of the charged extortion were the Local 1235 members whose property was obtained, not the union presidents, and no union member "testified to consenting to any property transfer." Appellant Br. at 54.[15] Indeed, in its bill of particulars, the government maintained that Local 1235 members were unaware that "their leadership was beholden to organized crime . . . [or] that tribute payments were being made to members of organized crime." Gov't Letter at 2, United States v. Coppola, 08-cr-763 (JG) (E.D.N.Y. May 22, 2009), ECF No. 33.

While styled as a sufficiency challenge, Coppola's argument appears to question the legal validity of the indictment, which specifically charged Coppola with conspiring to obtain the property of "Local 1235 union members . . . with the consent of such union members' officers, agents, delegates, employees and other representatives, which consent was to be induced by wrongful use of actual and threatened force, violence and fear." Indictment ¶¶ 16, 19. Coppola appears to be arguing that only a property owner, and not

despite having no position in the union and, in fact, being legally barred from having any dealings with union members, such control did not operate to the benefit of members. We need not pursue the matter further because, even without this evidence, the record of money payments to Coppola is sufficient to support a jury finding that he deprived Local 1235 members of the § 501(a) right to have union monies disposed of for their benefit and had obtained for himself the right to have such monies disposed of for the benefit of the Genovese family.

[15] The government does not argue, and we therefore do not consider, whether the union presidents were also members of the union.

an agent in possession, can provide the consent necessary to establish an extortion. We are not persuaded.

In Gotti, the district court similarly charged the jury that the members' agents, representatives, or trustees could provide the necessary consent. See United States v. Gotti, 459 F.3d at 329. While we had no occasion in Gotti to discuss the consent element of extortion, upon review of the language of the statute, we now clarify that there is no requirement that the property owner provide the necessary consent. See generally Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete." (internal quotation marks and citations omitted)); accord United States v. Salim, 549 F.3d 67, 78 (2d Cir. 2008).

Title 18 U.S.C. § 1951(b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The statute does not use the word "owner" to limit the class capable of giving the requisite consent. Nor would such a limitation make sense given that the consent element serves not to distinguish illegal from legal obtaining of property by the wrongful use of threats or fear, but rather to distinguish between two illegal means of so obtaining property: extortion (with consent) and robbery (without consent). See United States v. Zhou, 428 F.3d 361, 371–72 (2d Cir. 2005) (noting that

33

"victim's consent" is essential element of crime of extortion and "razor's edge that distinguishes extortion from robbery").

A predecessor statute employed somewhat different language with respect to the consent element: "[o]btains the property of another, with his consent." Anti-Racketeering Act of 1934, ch. 569, 48 Stat. 979, § 2(b) (emphasis added). Even if the quoted language from this earlier statute might be construed to require the consent of the person who owns the property obtained—a question we need not decide—the language of the phrase "obtaining of property from another, with his consent" in the current statute reaches more broadly. 18 U.S.C. § 1951(b)(2) (emphasis added). It references any circumstance in which property is obtained from a person with that person's consent. This plainly encompasses persons holding property in a fiduciary capacity for an owner, such as the union officials referenced in the indictment. Indeed, this court has upheld Hobbs Act convictions involving extortions of individuals not in lawful possession of the property obtained. See, e.g., United States v. Gotti, 459 F.3d at 325–26 (deeming "untenable" proposition that "one can never 'extort,' under the Hobbs Act, illegal property (such as narcotics)"); United States v. Scarpa, 913 F.2d 993, 999 (2d Cir. 1990) (affirming conviction for extorting rival drug dealers); see also United States v. Box, 50 F.3d 345, 353 (5th Cir. 1995) (affirming conviction for extorting forfeited drug proceeds); cf. United States v. Celaj, 649 F.3d 162, 168–69 (2d Cir. 2011) (affirming conviction for Hobbs Act robbery of marijuana). Moreover, we have recognized that businesses may be extorted

34

under the Hobbs Act by using threats or fear to induce certain employees' consent to part with company property.  See United States v. Daley, 564 F.2d 645, 649 (2d Cir. 1977).

Thus, while we have described the consent element by reference to "victim's consent," United States v. Zhou, 428 F.3d at 372, the requirement can be satisfied, as in this case, by showing that union officials were wrongfully induced to consent to surrender property that they held in trust for the union membership.  Indeed, while Local 1235 members were undoubtedly the primary victims of the charged extortion in that they lost both tangible and intangible property, their union presidents might also be deemed victims—albeit less sympathetic ones—insofar as they were forced to choose between "relinquishing some property [belonging to the membership] immediately or risking unlawful violence."  United States v. Arena, 180 F.3d 380, 395 (2d Cir. 1999).  The Hobbs Act "prohibits the extortionist from forcing a victim to make such a choice."  Id.; see United States v. Cain, 2012 WL 265882, at *6 (noting that extortion victim is presented with "Hobson's choice" (internal quotation marks omitted)).  Because there is no question as to the sufficiency of the evidence to permit a reasonable jury to find that Local 1235 presidents consented to surrender to the Genovese family property that the presidents held for the union membership, this part of Coppola's sufficiency challenge also fails.

c.    Use of Fear

Similarly meritless is Coppola's sufficiency challenge to that element of extortion requiring that consent be induced by the "wrongful use of actual or threatened force,

35

violence, or fear." 18 U.S.C. § 1951(b)(2). Insofar as Coppola submits that the government offered no evidence that he ever threatened any Local 1235 president in order to induce payments, we have held that the Hobbs Act "leaves open the cause of the fear" inducing a party to consent to part with property and does not require that such fear be "created by implicit or explicit threats." United States v. Gotti, 459 F.3d at 333 (internal quotation marks omitted). What is required is evidence that the defendant knowingly and willfully created or instilled fear, or used or exploited existing fear with the specific purpose of inducing another to part with property. See id.; United States v. Abelis, 146 F.3d 73, 83 (2d Cir. 1998).

Insofar as Coppola maintains that the cordiality of his March 6, 2007 conversations with Edward Aulisi precluded a finding of underlying fear, we are not convinced. A reasonable jury could have concluded that the necessary fear of Genovese family retaliation had been instilled over decades across the Manhattan and New Jersey waterfronts. See United States v. Hedman, 630 F.2d 1184, 1194 (7th Cir. 1980) (rejecting argument that seeming cordiality between extortionist and victim precluded finding that payment was induced by fear).

The totality of the evidence here demonstrated that "fear, intimidation, whatever" were the means routinely used by members of the Genovese family who conspired over half a century to control unions and businesses operating on the Manhattan and New Jersey waterfronts. Trial Tr. at 1114; see supra Part I.B. Unions and businesses that met

36

Genovese family payment demands were allowed to operate without interference. Those that did not faced personal violence and/or economic destruction.

Further, where an organized crime enterprise cultivates a reputation for violence and intimidation in achieving its conspiratorial goal of control throughout an industry or area, a jury may reasonably consider that reputation in assessing whether payments were induced by the exploitation of existing fear without an explicit or implicit threat. See United States v. Mulder, 273 F.3d 91, 103–04 (2d Cir. 2001) (noting that "[b]ad reputation is relevant to the fear element in a Hobbs Act conspiracy since such a reputation frequently conveys a tacit threat of violence" (internal quotation marks omitted)). Here, evidence showed that Coppola and his one-time captain Fiumara cultivated and used the Genovese family's reputation for violence in furtherance of extortionate endeavors. Thomas Buzzanca, vice president of Local 1804-1, which like Local 1235 was controlled by Fiumara and Coppola on behalf of the Genovese family, told William Montella, another Genovese extortion victim, that "everybody fears" Fiumara and that "we all live under[] fear" when dealing with him. Gov't Ex. TR-CD-5b at 1–2, 5. Coppola's willingness to exploit the fear attending the Fiumara crew was evidenced by his allusion to "contacts" in telling undercover officer Delaney that the price for labor peace was a percentage of his business's profits. Trial Tr. at 148. Further, the evidence showed that Cernadas, in making payments to Fiumara and Coppola on behalf of Local 1235, knew that these men had a reputation, even among their criminal confederates, for being

37

particularly powerful within the Genovese family. See id. at 1145. Viewed in this context, Coppola's March 6, 2007 statement to Edward Aulisi that "we were right next to" Cernadas "all the time" to prevent a union appointment is hardly benign. Rather, it demonstrates Coppola's exploitation of existing fear of Genovese family retaliation to achieve a result desired by the enterprise. Similarly, a reasonable jury could conclude that Vincent Aulisi's eagerness to assure Coppola that Local 1235 would continue to meet—and even exceed—its past tribute payments was animated by fear of organized crime retaliation. That conclusion is only reinforced by the fact that Vincent Aulisi felt obliged to give such assurances to a man who was a fugitive from the law and judicially barred from having anything to do with any ILA local. It was further evidenced by the younger Aulisi's subservient manner in accounting to Coppola for monies collected and explaining a possible delinquency.

In sum, we conclude that the evidence was sufficient to support the jury's finding that all elements of the extortion predicates of Racketeering Act One were proved.

### B.    The Pattern of Racketeering Activity

Coppola contends that the evidence was insufficient to demonstrate that the two proved racketeering acts were sufficiently related to each other and the charged enterprise to satisfy the pattern element of racketeering. See, e.g., United States v. Basciano, 599 F.3d 184, 202 (2d Cir. 2010) (discussing horizontal and vertical relatedness required to demonstrate pattern). Specifically, he argues that his reason for obtaining fraudulent

identification documents was "personal," i.e., to evade prosecution for murder, and unrelated to the enterprise or the charged extortion or fraud of Local 1235. This argument merits little discussion.

The pattern element serves to prevent application of the racketeering statute to "perpetrators of isolated or sporadic criminal acts." United States v. Payne, 591 F.3d 46, 64 (2d Cir. 2010) (internal quotation marks omitted). The Supreme Court, however, has described the pattern concept as "fairly flexible," so that it can be "demonstrated by reference to a range of different ordering principles or relationships between predicates." H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 238–39 (1989). "At the highest level of generality," both vertical and horizontal relatedness "can be established simply by connecting diverse predicate acts to an enterprise 'whose business is racketeering activity,' such as an organized crime family." United States v. Basciano, 599 F.3d at 202 (quoting United States v. Indelicato, 865 F.2d 1370, 1383 (2d Cir. 1989) (en banc)). Narrower patterns of racketeering may be defined and proved by reference to other unifying principles, including temporal proximity of the predicates, their common goals, similarity of methods, or repetitions. See id.

Here, even if Coppola could have secured fraudulent identification documents without regard to his membership in the Genovese family and without the assistance of Genovese confederates, the evidence showed that he availed himself of the cover provided by fraudulent documents not only to avoid a murder prosecution, but also to pursue his

39

"lifetime occupation" as part of organized crime. Sentencing Tr. at 32; see United States v. Burden, 600 F.3d 204, 217 (2d Cir. 2010) (holding that predicate may be related to enterprise even when defendant could have committed act absent connection to enterprise). As the district court aptly observed, the "elaborate scheme of identifications and phone cards and communications to stay a fugitive even as Mr. Coppola was a fully functioning captain of the Genovese family—a member, at least, of the Genovese family," showed that "none of that fugitivity had any impact on his illegal control of the union local over in New Jersey." Sentencing Tr. at 33. Indeed, Coppola's March 6, 2007 conversations with Edward Aulisi about the continued extortion of money from Local 1235 occurred within days of Coppola's conversations with his stepson Louis Rizzo concerning the procurement of fraudulent identification documents.[16] On this record, a jury could reasonably find a vertical relationship between Coppola's acquisition of fraudulent identification documents and the Genovese family enterprise because the fraudulent documents "facilitat[ed] . . . the enterprise's continuation of its criminal activities." United States v. Payne, 591 F.3d at 64 (concluding that murder of potential informant furthered enterprise by reducing threat of disruption by law enforcement). Further, insofar as the fraudulent documents facilitated the ongoing extortion of Local

[16] Although Coppola maintains that there was no evidence that Rizzo was associated with the Genovese family, record evidence supports an inference that Rizzo was involved with Coppola in enterprise activities. See, e.g., Gov't Ex. TR-CD-7 (T1) at 4–5 (Rizzo and Coppola discussing "squeeze play" for scrap metal); Gov't Ex. TR-CD-7 (T2) at 4 (Rizzo telling Coppola "we're running low on green, I'm gonna need to clean somebody").

1235, and both predicates were connected to the Genovese family enterprise, the evidence also established the requisite horizontal relationship.

United States v. Bruno, 383 F.3d 65 (2d Cir. 2004), cited by Coppola, is not to the contrary. There, we held that no rational juror could find certain shootings related to the charged enterprise—again, the Genovese family—because substantial evidence showed that the shootings occurred in contravention of Genovese protocols and so damaged the defendant's standing within that enterprise that the leadership considered killing him in response. See id. at 84–85. In that context, we ruled that the shootings were "simply personal matters." Id. at 85. No comparable evidence in this case indicates that Coppola maintained his fugitive status in defiance of the enterprise. To the contrary, the record shows that Coppola continued to earn money for the Genovese family while a fugitive and that the enterprise continued to reward Coppola for his efforts.

Accordingly, there is no merit to Coppola's sufficiency challenge to the pattern element of the racketeering counts of conviction.

C. Evidentiary Objections

Coppola contends that he was denied a fair trial by the admission of evidence of unlawful Genovese and Gambino activity that did not specifically implicate him or pertain to Local 1235. He alleges two types of error: (1) the admission of irrelevant or unfairly prejudicial evidence, see Fed. R. Evid. 401, 403; and (2) the admission of hearsay based

41

on a misapplication of the co-conspirator exception, see Fed. R. Evid. 801(d)(2)(E).  The arguments fail on the merits.

　　　　1.　　Rules 401 and 403

The standard of review applicable to Coppola's Rule 401/403 challenge is highly deferential in recognition of the district court's "superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice."  United States v. Abu-Jihaad, 630 F.3d 102, 131 (2d Cir. 2010).  Thus, "we will reverse an evidentiary ruling only for abuse of discretion, which we will identify only if the ruling was arbitrary and irrational."  Id. (internal quotation marks omitted).  We identify no such abuse in this case.

Insofar as Coppola challenges the admission of evidence of conduct distinct from the charged predicates and not directly involving Coppola, the district court reasonably found such evidence relevant to prove both the enterprise and pattern elements of the charged racketeering crimes.  See United States v. Turkette, 452 U.S. 576, 583 (1981) (recognizing that, although enterprise and pattern are distinct elements of racketeering, evidence proving these elements "may in particular cases coalesce"); accord United States v. Cain, 2012 WL 265882, at *8.  Evidence is "relevant" if it has "any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action."  Fed. R. Evid. 401.[17]  "[E]vidence of numerous

---

[17] To avoid future confusion, we quote the restyled Federal Rules of Evidence, which took effect December 1, 2011, because their substance is the same as the version in effect at

criminal acts by a variety of persons" may be relevant to prove the enterprise and pattern elements of racketeering. United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992). Thus, even though a defendant "may reasonably claim no direct participation" in the acts of others, evidence of those acts may be relevant to prove (1) the "existence and nature" of the racketeering enterprise, and (2) a pattern of racketeering activity by the defendant "by providing the requisite relationship and continuity of illegal activities." Id.; accord United States v. Basciano, 599 F.3d at 207 & n.17. Such conduct is not "other" crime evidence subject to Fed. R. Evid. 404(b); rather, it is evidence of the very racketeering crimes charged. See United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992); see also United States v. Basciano, 599 F.3d at 205 ("[I]t is the pattern of activity, not the predicates, that is punished by a racketeering conviction.").[18] Here, the challenged evidence, although outside the proved predicates and not always involving Coppola, nevertheless demonstrated both (1) the existence of the Genovese crime family, the charged enterprise; and (2) the proved predicates' part in a broad pattern of racketeering

the time of Coppola's trial. See Fed. R. Evid. 401 advisory committee's note.

[18] As we stated in Basciano, a broad pattern of racketeering, encompassing a wide range of criminal activities by an organized crime enterprise over several decades, affords the government "the greatest latitude to rely on a wide range of crimes" in carrying its burden to prove racketeering; at the same time, however, it "provides the broadest shield against a successive racketeering prosecution based on other criminal activities fitting within that pattern." 599 F.3d at 203. We have no occasion on this appeal to consider whether, or to what extent, the Double Jeopardy Clause might preclude any future prosecutions of Coppola for racketeering crimes based on the Genovese family's criminal control of the New York and New Jersey waterfronts.

spanning several decades whereby enterprise confederates used extortion and related crimes to control businesses and unions operating across the Manhattan and New Jersey waterfronts, in the process generating millions of dollars in revenues for the Genovese family.[19]

Nor can Coppola show that it was arbitrary or irrational for the district court not to have excluded the challenged evidence as more unfairly prejudicial than probative. See Fed. R. Evid. 403. While the proof of numerous uncharged criminal acts by members of a racketeering enterprise can pose a risk of prejudice to a single defendant, see United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007), on review of a district court decision to admit evidence, we "generally maximize its probative value and minimize its prejudicial effect," United States v. Abu-Jihaad, 630 F.3d at 132 (internal quotation marks omitted). Doing so here, we identify no error in the district court's determination that the highly probative value of the challenged evidence to prove enterprise and pattern outweighed the risk of unfair prejudice. See United States v. Mejia, 545 F.3d 179, 207 (2d Cir. 2008) (identifying no abuse of discretion in admission of similar evidence despite "significant risk of prejudice"). Indeed, the risk of unfair prejudice was not high in this case because the challenged evidence—consisting largely of extortion of waterfront businesses and

---

[19] Insofar as the challenged evidence pertained to wage amounts earned by enterprise-controlled employees, such evidence was relevant to proof of enterprise and pattern because it demonstrated Genovese family control of lucrative union positions. Thus, the evidence was relevant even without regard to the government's salary theory of extortion. Moreover, Coppola cannot show any unfair prejudice from its admission.

44

unions other than Local 1235—is not "especially worse or [more] shocking" than the activity charged in Racketeering Act One. United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009). Further, the district court adequately safeguarded against the possibility that the jury might convict Coppola based on crimes committed by others through instructions given both during the prosecution case and before deliberations. See United States v. Abu-Jihaad, 630 F.3d at 133 (upholding Rule 403 determination where limiting instruction minimized risk of prejudice); United States v. Mercado, 573 F.3d at 142 (noting "strong presumption that juries follow limiting instructions" (internal quotation marks omitted)).

Coppola further invokes Rules 401 and 403 to argue error in the admission of the 1991 default judgment barring him from contact with the ILA or any related labor organization. See Default Judgment, United States v. Local 1804-1, Int'l Longshoremen's Ass'n, AFL-CIO, 90-cv-96. He contends that such evidence was irrelevant and, in any event, more prejudicial than probative in the absence of any proof of his awareness of the judgment. We disagree. The judgment was relevant to demonstrate that Coppola's control of Local 1235 was necessarily corrupt because barred by law. Any questions as to Coppola's awareness of the judgment thus went to weight, not admissibility, and Coppola cannot claim unfair prejudice compelling a new trial where he was free to urge the jury to consider the absence of proof of notice in deciding what weight to accord the default judgment bar.

45

2.    Hearsay

Coppola's hearsay challenge to admitted out-of-court statements by persons other than himself fails because the district court reasonably found such statements admissible under Fed. R. Evid. 801(d)(2)(E).  Pursuant to that rule, a district court may admit an out-of-court declaration that would otherwise be hearsay if it finds "by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy."  United States v. Farhane, 634 F.3d at 161 (internal quotation marks omitted); see Bourjaily v. United States, 483 U.S. 171, 175–76 (1987). We review a district court's admission of evidence under Rule 801(d)(2)(E) only for clear error, see United States v. Farhane, 634 F.3d at 160–61, and we identify none here.[20]

In the context of organized crime, the conspiracy requirement of Rule 801(d)(2)(E) requires proof of more than "the general existence of the Mafia."  United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).  Rather, a preponderance of the evidence must demonstrate a common agreement to achieve a particular objective in furtherance of which the out-of-court statement is made.  See United States v. Russo, 302 F.3d 37, 44 (2d Cir.

---

[20] To the extent Coppola's hearsay challenge on appeal extends to statements to which he did not object at trial, our review is limited to plain error.  See United States v. Diaz, 176 F.3d 52, 83 (2d Cir. 1999).  We do not attempt to delineate which out-of-court statements are subject to clear error review and which to plain error review because, for the reasons stated in text, Coppola cannot demonstrate clear, much less plain, error.

2002). That said, the objective of the joint venture need not be any particular "crime charged in the indictment." Id. at 45.

The indictment in this case in fact charged two conspiracies: a subpredicate conspiracy, the object of which was to extort Local 1235 members, see Indictment ¶ 16, and a racketeering conspiracy, the object of which was to conduct the affairs of the Genovese family through a pattern of racketeering activity, see id. ¶ 25. While Coppola's hearsay challenge focuses on the narrower extortion conspiracy, it is the broader racketeering conspiracy that supports the district court's Rule 801(d)(2)(E) rulings, particularly as the object of the pattern of racketeering was grounded in two further conspiracies: a conspiracy between the Genovese and Gambino families to divide criminal control of the metropolitan New York waterfront, and a conspiracy among numerous Genovese confederates to use that enterprise's control over businesses and unions operating on the Manhattan and New Jersey waterfronts to generate large revenues for the enterprise.

A preponderance of the evidence, including the challenged out-of-court statements and independent corroborating evidence, easily established the existence of a racketeering conspiracy reaching beyond the agreement to extort Local 1235. See United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996) (holding that court may consider challenged statements in making Fed. R. Evid. 801(d)(2)(E) determination if supported by some independent corroborating evidence); Bourjaily v. United States, 483 U.S. at 177–79. A

preponderance of the evidence also demonstrated both Coppola's and each out-of-court declarant's membership in the larger conspiracy. Finally, a preponderance of the evidence supported the district court's determination that each out-of-court statement was made in furtherance of the racketeering conspiracy.

Accordingly, we reject Coppola's evidentiary challenges as without merit.[21]

D.      Jury Charge

Coppola asserts that three legal errors in the district court's jury instructions compel a new trial: (1) failure to charge "mere association"; (2) erroneously conveying a presumption of guilt in a supplemental instruction; and (3) failure to charge honest services as limited by Skilling v. United States, 130 S. Ct. 2896. We review a jury instruction challenge de novo, but we will reverse only where the charge, viewed as a whole, demonstrates prejudicial error. See United States v. Sabhnani, 599 F.3d 215, 237 (2d Cir. 2010). That is not this case.

1.      Mere Association

Although the district court did not state in so many words that more than "mere association with others engaged in criminal activity" is necessary to support a conviction, United States v. Ogando, 547 F.3d 102, 107 (2d Cir. 2008) (internal quotation marks

---

[21] We also deem meritless Coppola's contention that the district court abused its discretion in limiting the cross-examination of prosecution witness Robert Delaney regarding certain tangential matters. See United States v. Figueroa, 548 F.3d 222, 227 (2d Cir. 2008) (noting trial court's "broad discretion" to limit inquiry into potential bias of prosecution witness to avoid harassment, prejudice, or confusion of the issues (internal quotation marks omitted)).

omitted), it effectively conveyed that essential idea. In its conspiracy instruction, the court "stress[ed]" that "merely being present[] at a place where criminal conduct is underway doesn't make a person a member of a conspiracy" and that "the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of its unlawful ends." Trial Tr. at 1808. In its aiding and abetting instruction, the court stated that "the mere presence of a defendant where a crime is being committed, . . . even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient" and that the jury must find that defendant "participate[d] in the crimes charged as something he wished to bring about." Id. at 1810. Further, it conveyed that more than mere association was necessary to support conviction for substantive racketeering by its instruction that the jury must find that Coppola "played some part in the operation or management of the enterprise." Id. at 1826. Thus, we identify no error warranting a new trial. See United States v. Han, 230 F.3d 560, 565 (2d Cir. 2000) (holding that defendant "has no cause to complain" where court communicates substance of requested charge).

### 2. Supplemental Charge

In response to a jury request to "clarify how many acts have to be proven in order to reach a verdict on Count No. One," i.e., substantive racketeering, Trial Tr. at 1854, the district court instructed that "[b]efore you can find the defendant guilty of Count No. One,

49

you must find beyond a reasonable doubt unanimously that at least two racketeering acts have been proved," id. at 1859. The district court re-emphasized that proof of two acts was not itself sufficient to support conviction; the government was further required to prove each of the other elements of racketeering. Defense counsel expressly agreed to this instruction before it was read to the jury, raising an objection only after the jury indicated it had reached a verdict.

We need not here decide whether counsel's failure to object to the supplemental instruction before the jury resumed its deliberations limits our review to plain error, see Fed. R. Crim. P. 30(d), because the instruction was not error at all. Coppola contends that the instruction suggests a "goal to convict" insofar as it responds to a jury inquiry about the number of acts required to reach a "verdict" with the number of acts required to reach a "guilty verdict." Appellant Br. at 102. But the jury inquiry can only reasonably be construed to pertain to a guilty verdict as there would be no need to ask how many acts must be proved to return a verdict of acquittal. Because the supplemental instruction was a correct statement of the law, we identify no error.

### 3. Honest Services

Coppola faults the district court's honest services instruction for failing to charge the bribe-kickback element recognized in Skilling. He submits that this error requires a new trial because the concept of honest services "ran through the entirety of the

government's case to the other Act One subpredicates as well." Appellant Br. at 103. We disagree.

Where jury instructions omit an element of the charged crime, we review the error for harmlessness beyond a reasonable doubt. See United States v. Brunshtein, 344 F.3d 91, 99–100 (2d Cir. 2003) (asking whether it is "'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error'" (quoting Neder v. United States, 527 U.S. at 18)). Here, the error related only to the wire fraud subpredicate, and not to the extortion subpredicates. The district court correctly charged the intangible rights theory of extortion by reference to the LMRDA's enumerated duties, making no mention of the general right to honest services, which it referenced only in the context of the wire fraud subpredicate. Nor did the government invoke any right to honest services in its summation relating to extortion, relying only on the LMRDA right to have union officials manage union property "in their [i.e., the members'] interest alone." Trial Tr. at 1645. On this record, we conclude beyond a reasonable doubt that the jury would have found the extortion subpredicate proved even absent the error in charging wire fraud. Thus, no new trial is warranted.[22]

---

[22] Because the error is harmless under the Neder standard, we need not consider whether application of that standard is unnecessary because the error did not pertain to the subpredicate on which we rely to affirm the conviction. Nor need we consider how the standard of review might be affected by Coppola's failure to raise this issue before the district court. See United States v. Bahel, 662 F.3d 610, 634 (2d Cir. 2011) (noting we have applied a "modified plain error approach" where a jury instruction error arises due to intervening case law, but leaving open whether this approach survives Johnson v. United States, 520 U.S. 461 (1997)).

E.     Sentencing

Coppola argues that his sixteen-year sentence is unreasonable, both as a matter of procedure and substance.  See United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (recognizing procedural and substantive components of reasonableness review). In reviewing a sentence for reasonableness, we apply a standard akin to abuse of discretion, see id. at 187–88, and we identify no such abuse here.

1.     Procedural Reasonableness

A mistaken Guidelines calculation is a procedural error that can render even a non-Guidelines sentence unreasonable.  See id. at 190.  Coppola submits that the district court committed such error here in determining the loss attributable to his subpredicate crimes of extortion and fraud.  He further complains that the district court misapplied U.S.S.G. § 5G1.3 in ordering his racketeering sentence to run consecutively to his undischarged 42-month sentence for conspiring to harbor a fugitive.  We address each argument in turn.

a.     Loss Calculation

While Coppola approves the district court's refusal to rely on salary aggregation to calculate the loss attributable to the extortion and fraud subpredicates, he contends that the district court engaged in impermissible speculation in finding that these subpredicate crimes caused a loss of at least $2.5 million in monies paid to the Genovese family.  See U.S.S.G. § 2B1.1(b)(1)(J) (triggering eighteen-point enhancement in fraud offense level);

52

id. § 2B3.2(b)(2) (referencing § 2B3.1(b)(7)(G)) (triggering six-point enhancement in extortion offense level).[23] We disagree.

In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation. See United States v. Deutsch, 987 F.2d 878, 886 (2d Cir. 1993). Such evidence need not, however, establish loss with absolute precision; it need only permit the district court to make "a reasonable estimate of the loss" given the available information. U.S.S.G. § 2B1.1 cmt. n.3(C); see United States v. Markle, 628 F.3d 58, 64 (2d Cir. 2010) (applying same rule to U.S.S.G. §§ 2B3.1 and 2B3.2). The record here showed that the Genovese family controlled Local 1235 for more than thirty years. Thus, to cause a loss of more than $2.5 million over thirty years, the Genovese family would have had to extort approximately $84,000 annually from Local 1235. Record evidence convincingly demonstrates that it was more likely than not that the Genovese family obtained that amount. See United States v. Hertular, 562 F.3d 433, 447 (2d Cir. 2009) (concluding that preponderance finding satisfied if fact's existence was "more likely than not").

---

[23] Coppola does not contend that revenues were an inappropriate measure of loss. U.S.S.G. § 2B3.2 cmt. n.5 specifically defines extortion loss to mean "any demand paid plus any consequential loss from the offense." As to fraud, U.S.S.G. § 2B1.1 cmt. n.3(B) provides for a court to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined," which is this case. Thus, we consider only Coppola's complaint that the district court's determination of realized revenues from the subpredicate crimes was entirely speculative.

As the district court noted, Coppola alone obtained sufficient amounts from his control of Local 1235 to support himself and his wife comfortably for eleven years while he was a fugitive, maintaining two residences, one in San Francisco and the other on Manhattan's Upper West Side. Common sense instructs that such a lifestyle would require revenues of no less than $50,000-$100,000 per year.[24] Further, as the district court noted, Coppola was hardly the only Genovese associate to receive revenues corruptly generated from Local 1235. Over the years, Local 1235 monies were also paid to Fiumara and others. No precise figures are necessary to conclude that the total payments from Local 1235 to multiple enterprise members would easily have exceeded $84,000 annually and $2.5 million over the course of thirty years.

---

[24] While it is more likely than not that the monies channeled to Coppola by Genovese confederates during his years as a fugitive derived from Local 1235, especially given evidence that Coppola extorted that entity right up until his arrest, even if the monies might have derived from other enterprise activities, the district court would properly have included such revenues in its calculation of loss attributable to the racketeering crimes of conviction. See U.S.S.G. § 1B1.3(a)(1). In focusing on revenues more likely than not derived from Local 1235, the district court was simply demonstrating how conservative a $2.5 million loss calculation was in this case.

Indeed, the conclusion is reinforced by other record evidence.[25] That evidence showed that the Genovese family demanded several thousand dollars a month in tribute payments from each waterfront entity it controlled, and much larger Christmas payments, reaching as high as $90,000–$100,000, amounts that over thirty years easily would exceed $2.5 million. See U.S.S.G. § 2B1.1 cmt. n.3(C)(vi) (identifying "revenues generated by similar operations" as factor appropriately considered in estimating loss). Coppola's March 6, 2007 conversation with Edward Aulisi indicated that such payments increased significantly over the course of the conspiracy. See Gov't Ex. Tr-CD-7 (T6) at 6 (noting that collections had "almost doubled"). Further, record evidence showed that a Genovese-controlled union paid Larry Ricci $45,000 a year for doing nothing but putting "his feet on the desk," unless Fiumara "called him for something." Trial Tr. at 150.[26] Whether the union in question was Local 1235 or some other ILA local—a point on which the record is not clear—evidence that the Fiumara crew could compel a local to pay a single crew member $45,000 a year in the 1970s strongly supports the inference that the total annual

---

[25] While the district court did not specifically reference other evidence in estimating loss, we assume its familiarity with the record of a lengthy trial over which it presided, just as it was entitled to assume the parties' familiarity with this record. Thus, to the extent that on appellate review, we can identify evidence in the record supporting the challenged loss estimate with respect to Local 1235, we easily reject the argument that the district court could only have relied on speculation to make this Guidelines finding. See United States v. Cavera, 550 F.3d at 211 (holding that factual finding at sentencing will not be deemed clearly erroneous unless it is "without foundation" (internal quotation marks omitted)).

[26] The creation of such a "no-work job" channeled union money directly into the hands of a Genovese family member and, thus, constitutes extortion independent of the salary theory relied on by the government with respect to union presidents.

amount the Genovese family demanded and obtained from any local, including Local 1235, was easily double, resulting in a loss over thirty years of more than $2.5 million. See U.S.S.G. § 2B1.1 cmt. n.3(C)(vi). Indeed, the fact that a single Genovese member, Barone, testified that he personally made "millions" as a result of the enterprise's corrupt control of the waterfront, Trial Tr. at 1103, further supports an inference that, over thirty years, an individual victim such as Local 1235 would have made total extortion payments to the enterprise of over $2.5 million.

No further inquiry into loss could possibly have inured to Coppola's benefit. As the district court recognized, the record convincingly established his membership in a conspiracy to gain corrupt control not simply over Local 1235, but over a number of waterfront unions and businesses. Thus, any more detailed inquiry would only have multiplied the loss amount several times over. See United States v. Leslie, 658 F.3d 140, 145 (2d Cir. 2011) (calculating loss by reference to entire conspiracy); see also U.S.S.G. § 1B1.3(a)(1)(B) (holding defendant responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity").[27]

The reason the district court did not undertake such an inquiry is apparent: it had determined that, in any event, the racketeering Guidelines were "woefully insufficient . . .

---

[27] Because the district court limited its loss calculation to revenues the Genovese family realized from its control of Local 1235, and because Coppola points to no evidence that losses to that entity informed his pre-Guidelines sentence in United States v. Clemente, 494 F. Supp. 1310 (S.D.N.Y. 1980), aff'd, 640 F.2d 1069 (2d Cir. 1981), Coppola's claim of procedural error in "double-counting" is plainly meritless.

to capture the essence" of Coppola's crime. Sentencing Tr. at 34. As indicated in the Background section of this opinion, see supra Part I.C, the district court thoroughly and persuasively explained its reasons for reaching this conclusion, which are completely distinct from any loss calculation in this case. Thus, even if we were to identify procedural error in that calculation—which we do not—we could confidently conclude that it was harmless because the district court would certainly impose the challenged sentence in any event.[28]

Accordingly, we reject the claim of procedural error in calculating loss as without merit.[29]

---

[28] We do not, of course, lightly assume that the elimination of unwarranted enhancements from a Guidelines calculation would not affect the sentence imposed so as to support a finding of harmless error. See United States v. Feldman, 647 F.3d 450, 458–60 (2d Cir. 2011). Where we identify ambiguity, we will order remand. See id. at 460. But just as a single unambiguous statement can permit us to identify a Guidelines error as harmless in some circumstances, see United States v. Jass, 569 F.3d at 68, we can draw the same conclusion from a careful review of the totality of a sentencing record.

[29] No different conclusion is warranted by the fact that the offense level for Coppola's racketeering crimes is dictated by the fraud subpredicate, rather than the extortion subpredicates on which we relied to affirm the conviction. See supra Part II.A.

As earlier noted, the fraud subpredicate was based on both a theory of intangible property—honest services fraud—that the government does not defend in light of Skilling v. United States, 130 S. Ct. 2896, and a theory of tangible property in the form of both union president salaries and tribute payments. Because the jury returned a general verdict as to tangible property fraud, Coppola's validity challenge to the salary theory, if successful, might undermine reliance on the fraud subpredicate as support for Racketeering Act One. See Yates v. United States, 354 U.S. at 312.

No such concern applies to the sentencing, however, under the circumstances of this case. The law does not require that relevant conduct support a conviction to be factored into a Guidelines calculation; even acquitted conduct may be considered if supported by a preponderance of the evidence. See United States v. Vaughn, 430 F.3d at 526. Thus, as long

b.      Imposition of a Consecutive Sentence

We similarly identify no merit in Coppola's claim of procedural error under U.S.S.G. § 5G1.3 in the district court's direction that the sixteen-year sentence imposed for his racketeering crimes in this case run consecutively to, rather than concurrently with, the 42-month sentence that Coppola was then serving on the single count of conspiracy to harbor a fugitive imposed in United States v. Coppola, 07-cr-225 (DLI).

Section 5G1.3 guides the imposition of sentences where a defendant is subject to an undischarged term of imprisonment "with an eye toward having such punishments

as (1) the district court's reliance on the fraud Guideline was based on the tribute payment theory—whose validity Coppola does not dispute—and (2) a preponderance of the evidence supports that theory, there would be no Guidelines calculation error in relying on fraud rather than extortion to determine the offense level.

The first question is answered by the district court's loss calculation, which made plain that the court found that the Genovese family extracted tribute from Local 1235. Indeed, the district court specifically declined to rely on the aggregation of salaries.

As to the second question, a preponderance of the evidence supports the district court's finding that Coppola deprived Local 1235 members of such revenues, for the reasons enumerated supra Part II.A.2.a. Although the district court at sentencing did not discuss Coppola's use of fraudulent means to procure the revenues, the jury necessarily found that element satisfied by its verdict, particularly as there is no difference between the fraudulent means used to procure either form of tangible property in this case. The sufficiency of that finding is supported by evidence that the payments were made in violation of the presidents' LMRDA duties to union members and by such concealment efforts as the use of coded conversations and surrogates to assure Coppola—an organized crime member then under a court order prohibiting him from having any dealings with unions—that the Genovese family's extortion demands would continue to be satisfied.

In sum, any concern under Yates v. United States, 354 U.S. at 312, that the general jury verdict finding tangible wire fraud may have rested not on the valid tribute payment theory but on the potentially invalid salary theory has been satisfactorily eliminated from the sentencing proceeding by the district court's findings that Coppola fraudulently deprived Local 1235 members of tangible property through the collection of tribute.

58

approximate the total penalty that would have been imposed had . . . all of the offenses been prosecuted in a single proceeding." Witte v. United States, 515 U.S. 389, 404–05 (1995). Toward that end, § 5G1.3(b) provides for a concurrent sentence where the prior offense is relevant conduct to the instant offense and "was the basis for an increase in the offense level for the instant offense." Coppola's harboring conviction may have been relevant conduct to Racketeering Act Three's fraudulent document offense, but the harboring offense did not increase the offense level for that predicate, which in any event had no impact on Coppola's total offense level for the crimes of conviction. That offense level was determined by the subpredicates of Racketeering Act One. Where § 5G1.3(b) does not apply, the Guidelines leave it entirely to the district court's discretion whether to impose sentence "concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense," U.S.S.G. § 5G1.3(c), consistent with the factors outlined in 18 U.S.C. § 3553(a), see U.S.S.G. § 5G1.3 cmt. n.3(A)(i).[30]

Coppola complains that, even if the district court could have imposed a consecutive sentence, it committed procedural error by failing adequately to explain its reasons for doing so. Our precedent does not support this argument. Even when we understood the Guidelines to be mandatory, we had ruled that "nothing in the language of [§ 5G1.3(c)] or its Commentary requires district courts to make specific findings with respect to any or all

---

[30] To the extent the Guidelines are advisory, the district court would have the discretion not to follow § 5G1.3(b) even where applicable.

of the factors listed in the Commentary or § 3553(a)." United States v. Brennan, 395 F.3d 59, 69 (2d Cir. 2005) (internal quotation marks and alterations omitted). More recently, we have ruled with respect to sentencing generally that, "[i]n the absence of record evidence suggesting otherwise, we presume that the district court has faithfully discharged its duty to consider the § 3553(a) factors." United States v. Payne, 591 F.3d at 71 (internal quotation marks omitted).

Nothing in the record suggests that the district court failed to consider the § 3553(a) factors here, either in its identification of a sixteen-year prison term for the racketeering crimes at issue or in its decision to run that sentence consecutively to the undischarged sentence for harboring. Rather, such consideration is evident in the district court's explanation for imposing a non-Guidelines sentence, an explanation that discussed the seriousness of the criminal conduct, the need for general and specific deterrence, favorable mitigating factors, and inadequacies in the racketeering Guidelines. See 18 U.S.C. § 3553(a). The district court made clear that it selected a sixteen-year sentence—as opposed to a still higher term—precisely because Coppola would also serve 42 months for harboring conduct related to Racketeering Act Three. In sum, the record indicates that the district court committed no procedural error in imposing its sentence consecutively in order to approximate the total non-Guidelines sentence that it would have imposed had all the offenses been prosecuted in a single proceeding. See Witte v. United States, 515 U.S. at 404–05.

60

2.      Substantive Reasonableness

Coppola contends that a sixteen-year sentence—particularly when run consecutively to a 42-month sentence—is substantively unreasonable given his age, his health, and the lesser sentences imposed on others convicted of participating in organized crime efforts to maintain criminal control over the New York–New Jersey waterfront.

Where no procedural error has been committed, our review of a claim that a non-Guidelines sentence is substantively unreasonable is narrow. As the Supreme Court has instructed, "it is not for the Court of Appeals to decide de novo whether the justification for a variance is sufficient or the sentence reasonable." Gall v. United States, 552 U.S. 38, 59 (2007); see United States v. Cavera, 550 F.3d at 189. Rather, we "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Gall v. United States, 552 U.S. at 51. We will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." United States v. Cavera, 550 F.3d at 189 (emphasis in original; internal quotation marks omitted); see United States v. Jones, 531 F.3d 163, 174 (2d Cir. 2008) (recognizing that in "great majority of cases, a range of sentences—frequently extending well beyond the narrow ranges prescribed by the Guidelines—must be considered reasonable"). This case is no exception.

The record makes clear that the district court considered mitigating factors such as Coppola's age—63 at the time of sentencing—and various health conditions, but

61

concluded that they were outweighed by the seriousness of his criminal conduct, which reflected "a lifetime occupation as part of an organization" whose power "derive[d] from a well grounded fear that if you cross a member of that organization you will be killed." Sentencing Tr. at 32–33. The district court pointedly told Coppola that it refused to let him "hide behind" mitigating factors:

> You knew full well when you committed yourself to a life of crime that if and when you finally got caught you would be held accountable and you should be held accountable. That's what I intend to do here today is hold you accountable for the choices you made to be a part of that organization and to dedicate yourself to a life of crime.

Id. at 33–34. Coppola may disagree with how the court weighed the seriousness of his criminal conduct as against his age and health, but he can hardly show that his criminal conduct was not sufficiently severe to bear the weight assigned it under the totality of the circumstances. See United States v. Cavera, 550 F.3d at 191 (stating that appellate courts "do not consider what weight we would ourselves have given a particular factor," but decide only whether the factor "can bear the weight assigned" by the district court).

Nor can Coppola demonstrate that his sentence is substantively unreasonable by conclusorily complaining of a sentencing disparity with his chosen comparators on appeal, Primo Cassarino and Anthony Ciccone. See 18 U.S.C. § 3553(a)(6).[31] While both men were convicted for racketeering and other crimes related to the Gambino family's control over parts of the New York waterfront, that is not enough by itself to compel a conclusion

---

[31] Coppola points us to no indication in the record that he presented the examples of Cassarino and Ciccone to the district court.

that they were similarly situated to Coppola in the many respects that can inform a sentence. See United States v. Fernandez, 443 F.3d 19, 32 (2d Cir. 2006) (rejecting disparity challenge where there was no showing that defendants were "similarly situated"). Moreover, "even if § 3553(a)(6) were a lawful basis for leniency here, . . . it is only one of several factors that must be weighted and balanced" and how the factor is weighed "is a matter firmly committed to the discretion of the sentencing judge." Id.

Accordingly, we conclude that the challenged sentence is not unreasonable so as to warrant vacatur and resentencing.

## III.    Conclusion

To summarize, we conclude as follows:

1.  Racketeering Act One states valid subpredicate offenses under the Hobbs Act for substantive and conspiratorial extortion of intangible rights under the LMRDA, 29 U.S.C. § 501(a), see United States v. Gotti, 459 F.3d at 325, and the jury's finding that such offenses were proved is supported by sufficient evidence.  The validity of these Hobbs Act offenses is not undermined by Skilling v. United States, 130 S. Ct. 2896.

2.  The evidence was sufficient to permit a reasonable jury to find the requisite pattern of racketeering proved.

3.   The district court's admission of challenged evidence did not exceed its discretion under Fed. R. Evid. 401, 403, or 801(d)(2)(E).

4.  Various challenges to the district court's jury instructions are without merit.

5.    The challenged sentence is reasonable both as a matter of procedure and substance.

The judgment of the district court is hereby AFFIRMED.